PEOPLE v WHITNEY

PEOPLE v FYVIE

PEOPLE v SURGENT

Docket Nos. 191167, 191168, 191969. Submitted January 7, 1998, at Lansing. Decided February 24, 1998, at 9:00 A.M. Leave to appeal denied, 457 Mich 888.

Charles L. Whitney, James Fyvie, Danny Surgent, and John Miller, members of the Vassar City Council, were tried by a jury in the 71-B District Court, Kim D. Glaspie, J., on charges based on allegations that they intentionally violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, in connection with the holding of certain closed sessions of the council. Miller was acquitted, Whitney and Fyvie were each convicted of one count of intentionally violating the OMA and one count of conspiracy to violate the OMA, and Surgent was convicted of one count of intentionally violating the OMA. Whitney, Fyvie, and Surgent (the defendants) appealed and the Tuscola Circuit Court, Nick O. Holowka, J., affirmed. The defendants appealed by leave granted. The appeals were consolidated.

The Court of Appeals *held*:

Although there is sufficient evidence to support the finding that the closed session on December 9, 1992, violated the OMA, the convictions must be reversed and the matter must be remanded to the district court for a new trial because the district court's jury instructions regarding intent allowed the defendants to be convicted without a finding that they intentionally violated the OMA.

1. The council is a public body that conducted a closed meeting and made a decision effectuating public policy at the meeting. No exceptions to the OMA were applicable.

2. The exemptions in the OMA are to be strictly construed.

3. The exempt-material provision in the OMA, MCL 15.268(h); MSA 4.1800(18)(h), did not apply with regard to the material discussed at the closed session. The attorney-client-privilege exception of the Freedom of Information Act (FOIA), MCL 15.243(1)(h); MSA 4.1801(13)(1)(h), did not trigger the exempt-material provision of the OMA. The proper discussion of a written legal opinion at a

closed meeting is, with regard to the attorney-client privilege, limited to the meaning of any strictly legal advice presented in the written opinion. The attorney-client-privilege exception does not extend to matters other than the provision of strictly legal advice. The defendants' receipt of an oral legal opinion and discussion of nonlegal matters at the closed session went beyond the scope of the attorney-client-privilege exception of the FOIA. The other-privilege exemption of the FOIA, MCL 15.243(1)(i); MSA 4.1801(13)(1)(i), did not authorize the closed meeting on the basis of the work product privilege, MCR 2.302(B)(3)(a), for purposes of application of the exempt-material provision of the OMA.

4. The specific-pending-litigation exemption of the OMA, MCL 15.268(e); MSA 4.1800(18)(e), did not apply in this case, where the matters being discussed were mere settlement negotiations before the institution of any type of litigation.

5. The crime of intentionally violating the OMA, MCL 15.272; MSA 4.1800(22), is a specific intent crime that has three elements: the defendant must be a member of a public body, the defendant must have actually violated the OMA in some fashion, and the defendant must have intended to violate the OMA. The district court erred in instructing the jury in a manner that allowed the jury to find the requisite intent element satisfied if the defendants were aware of a high probability that they were violating the OMA unless the defendants actually believed in good faith that they were not violating the OMA. A defendant must have a subjective desire to violate the OMA or knowledge that the defendant is committing an act violative of the OMA, and no degree of recklessness or even deliberate ignorance suffices to establish the intent necessary to establish a specific intent crime. The convictions of intentionally violating the OMA must be reversed.

6. The convictions of conspiracy to commit the crime of intentionally violating the OMA, MCL 750.157a; MSA 28.354(1), also must be reversed because of the erroneous jury instruction regarding the crime of intentionally violating the OMA.

Reversed and remanded.

1. STATUTES — OPEN MEETINGS ACT — JUDICIAL CONSTRUCTION.

The Open Meetings Act should be broadly interpreted and its exemptions strictly construed (MCL 15.261 *et seq.*; MSA 4.1800[11] *et seq.*).

2. STATUTES — OPEN MEETINGS ACT — WORDS AND PHRASES — MEETING.

The Open Meetings Act provides that if an entity is a public body, its meetings, except those falling within a statutory exception, must be open to the public and held in a place available to the general public; the public body's decisions must be made at a meeting open to

the public and all deliberations of a quorum of the public body must take place at a meeting open to the public; the act defines a "meeting" as the convening of a public body at which a quorum is present for the purpose of deliberating toward or rendering a decision on a public policy (MCL 15.262[b], 15.263[1],[2],[3]; MSA 4.1800[12][b], 4.1800[13][1],[2],[3]).

3. STATUTES — OPEN MEETINGS ACT — WORDS AND PHRASES — DECISION.

The Open Meetings Act defines a "decision" as a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body effectuates or formulates public policy (MCL 15.262[d]; MSA 4.1800[12][d]).

4. STATUTES — OPEN MEETINGS ACT — EXCEPTIONS — FREEDOM OF INFORMATION ACT — ATTORNEY-CLIENT PRIVILEGE.

The section of the Open Meetings Act that permits a public body to meet in closed session to consider material exempt from discussion or disclosure by state or federal statute allows a closed session for consideration of a written legal opinion within the attorney-client-privilege exception of the Freedom of Information Act; closed sessions may not be held to receive oral legal opinions; proper discussion of a written legal opinion at a closed meeting is, with regard to the attorney-client privilege, limited to the meaning of any strictly legal advice presented in the written opinion; the attorney-client-privilege exemption does not extend to matters other than the provision of strictly legal advice and does not encompass bargaining, economics, or other tangential nonlegal matters (MCL 15.243[1][h], 15.268[h]; MSA 4.1801[13][1][h], 4.1800[18][h]).

5. STATUTES — OPEN MEETINGS ACT — EXCEPTIONS — FREEDOM OF INFORMATION ACT — OTHER PRIVILEGES.

The "other-privilege" exemption of the Freedom of Information Act should not be interpreted as providing a greater allowance for closed-door discussion of a matter by a public body under the "exempt-material" provision of the Open Meetings Act on the basis of the receipt from an attorney of a written document within the scope of the work product privilege, provided by MCR 2.302(B)(3), than there would be under the attorney-client privilege of the Freedom of Information Act (MCL 15.243[1][h],[i], 15.268[h]; MSA 4.1801[13][1][h],[i], 4.1800[18][h]).

6. STATUTES — OPEN MEETINGS ACT — EXCEPTIONS — WORDS AND PHRASES — SPECIFIC PENDING LITIGATION.

The phrase "specific pending litigation" in the section of the Open Meetings Act that allows a public body to meet in a closed session generally refers to proceedings in a case that actually has been filed in a court of law; however, active participation with an opponent in some type of alternative dispute resolution mechanism without a suit having been filed in a court of law may be considered "litigation"; the term "litigation" does not extend to mere settlement negotiations before the initiation of any type of proceeding in which a judge, an arbitrator, or a similar third party or body would be expected, in the absence of a settlement, to ultimately render a decision in the case (MCL 15.268[e]; MSA 4.1800[18][e]).

7. CRIMINAL LAW — INTENTIONALLY VIOLATING OPEN MEETINGS ACT — SPECIFIC INTENT.

The crime of intentionally violating the Open Meetings Act is a specific intent crime consisting of three elements: the defendant must be a member of a public body, must have actually violated the act in some fashion, and must have intended to violate the act; therefore, the defendant must have a subjective desire to violate the Open Meetings Act or knowledge that the defendant is committing an act violative of the Open Meetings Act and no degree of recklessness or even deliberate ignorance suffices to establish specific intent (MCL 15.272[1]; MSA 4.1800[22][1]).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Arthur A. Busch*, Prosecuting Attorney, and *Donald A. Kuebler*, Chief, Appeals, Research, and Training, for the people.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec* and *Dennis J. Clark*), for the defendants.

Before: FITZGERALD, P.J., and O'CONNELL and WHITBECK, JJ.

WHITBECK, J. All three defendants-appellants in this case, Charles L. Whitney, James Fyvie, and Danny Surgent (defendants), were members of the Vassar

City Council in 1992.[1] They were charged with misdemeanors on the basis of allegations that they intentionally violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, in connection with holding closed sessions of the council on November 23, 1992, and December 9, 1992.[2] Defendants Whitney and Fyvie were each convicted by a jury in the district court of one count of intentionally violating the OMA, MCL 15.272; MSA 4.1800(22), on the basis of their involvement in the holding of a closed session of the council on December 9, 1992, and one count of conspiracy to intentionally violate the OMA, MCL 750.157a; MSA 28.354(1), but were acquitted of all other charges. Defendant Surgent was convicted of one count of intentionally violating the OMA on the basis of his involvement in the holding of the December 9, 1992, closed session.[3] Defendants appealed to the circuit court, which affirmed their convictions. The defendants appealed to this Court by leave granted. The appeals were consolidated. While we find that there was sufficient evidence at trial to conclude that the closed session on December 9, 1992, violated the OMA, we reverse and remand to the district court for a new trial because its jury instructions regarding intent allowed defendants to be convicted

---

[1] Defendant Whitney was selected by the council from among its own membership to be mayor of the city. In that position, he was a voting member of the council.

[2] To our knowledge, this is the first criminal prosecution brought in Michigan based on alleged violations of the OMA.

[3] John Miller, who was a member of the council on November 23 and December 9, 1992, was tried together with the three defendants on charges related to alleged intentional violations of the OMA. However, Miller was acquitted by the jury of all offenses with which he was charged.

without a finding that they *intentionally* violated the
OMA.

## I. FACTS

At the November 1992 general election, defendants,
John Miller, and Shirley Seney were elected as the
five members of the council. For reasons that are not
entirely clear from the record, it appears that defend-
ants and council member Miller were displeased with
the job performance and policies followed by Michael
LaChance, then the city manager of the city of Vassar.

Michael Sauer, the city attorney for the city of Vas-
sar,[4] testified that, just after the November 1992 elec-
tion, Surgent telephoned him at his office and indi-
cated that he was calling on behalf of a majority of
the members of the council. According to Sauer,
Surgent asked if they could have a meeting with
Sauer "so that they could discuss the termination of
Mr. LaChance's employment." However, Sauer wrote a
letter in which he advised that it would be in the best
interest of the city to have another attorney for that
matter because of Sauer's close working relationship
and friendship with LaChance.

James Walker, the superintendent of the city of Vas-
sar's wastewater treatment plant, testified that, on the
weekend before November 23, 1992, Whitney and
Fyvie visited him at home and asked him if he would
be interested in taking over as interim city manager if
needed. Walker also testified that one or both of them
told him that they were planning to place LaChance

---

[4] Sauer testified that his law firm was the city attorney, but that he was
"the acknowledged city attorney," apparently meaning that Sauer handled
or primarily handled the legal representation of the city on behalf of his
law firm.

on administrative leave and eventually replace him because they were dissatisfied with the way that LaChance was conducting himself as the city manager.

At the November 23, 1992, meeting of the council, Whitney made a motion to go into a closed session to discuss personnel matters and Surgent seconded it.[5] In response to a question from LaChance, Whitney advised that "[t]he personnel is you [LaChance], and it has to do with considering your employment."[6] LaChance then, in essence, objected to the holding of this closed session on the ground that he had not requested a closed session. Whitney requested that LaChance provide him with a copy of the OMA. LaChance testified that he gave Whitney an item that included "a copy of the condensed Open Meetings Act . . . provided by, or printed by the state legislature and passed out by various and sundry congressmen [sic] and senators in Lansing." After further discussion, the council voted to go into closed session, with defendants and Miller voting for the motion. Defendants and Miller left the room where the open council meeting was being held and apparently went to the city manager's office to meet privately.[7]

---

[5] Earlier in the meeting, the city council had gone into an initial closed executive session to discuss a previously filed, pending lawsuit between the city of Vassar and Tuscola Township. The prosecution did not charge defendants with any criminal act with regard to that first executive session.

[6] Substantial portions of the tape recordings of the November 23, 1992, and December 9, 1992, meetings of the council made by the city clerk were played before the jury at defendants' trial.

[7] According to trial testimony, council member Seney who voted against the motion to go into executive session did not go to this closed executive session.

After a few minutes, defendants and Miller returned to the open meeting. Whitney then said, "Let it be noted that the executive session has been determined to be illegal, was not held." Thereafter, in open session, defendants and Miller voted in favor of a successful motion to place LaChance on administrative leave, effectively suspending him with pay, from his position as city manager. Later during this open session, defendants and Miller voted to go into closed session to consider employment of a temporary replacement for the city manager. After returning from this closed session to the open session, the council appointed James Walker as "temporary city manager." The council also passed a motion to appoint the law firm of which attorney Thomas Demetriou was a member to represent the city of Vassar with regard to the city manager situation.[8]

Between the council meetings held on November 23, 1992, and December 9, 1992, Demetriou and John Humphreys, an attorney representing LaChance, negotiated on behalf of their respective clients toward a possible agreement under which LaChance would resign as city manager in return for a settlement package.

At the December 9, 1992, council meeting, Whitney stated that he "would entertain a motion at this time for us to retire to executive session to discuss ongoing negotiations." Fyvie then moved "that we go into executive session for purposes of discussing the city manager's position," and Surgent seconded the motion. Seney asked, "This is for negotiations, or is

---

[8] All three defendants were acquitted of charges of intentionally violating the OMA that were based on their conduct at the November 23, 1992, council meeting.

this for the city manager?" Fyvie replied, "Whatever the discussion leads to within the city manager's position. I think that clarifies it." Humphreys, on behalf of LaChance, objected to the council's going into closed session as being a violation of the OMA. Whitney said that the objection was "overruled" and further stated, "It is certainly correct if we were going into executive session to discuss discipline, all of what you have said is certainly correct. However, it's been stated that we're going into executive session for the purpose of negotiations, and as you well know, you don't negotiate in public." After another observer of the council meeting pointed out that the motion made by Fyvie did not include a reference to negotiations, Fyvie said, "if it would appease the people, I will amend that motion to include the city manager negotiations." Surgent said that he seconded the amended motion. The "amended motion" then passed by a 4 to 1 vote with defendants and Miller in the majority. Then, defendants and Miller went into closed session. Seney, the council member who voted against the motion, did not attend the closed session. However, Demetriou attended this closed session.

The transcript of the closed session held on December 9, 1992, reflects that, near the beginning of this closed session, Whitney said that one of the reasons for meeting in closed session was "so that he [LaChance] won't have the benefit of knowing how everybody feels as far as these negotiations." Demetriou told the council members various aspects of the negotiations that he had been pursuing with Humphreys. Demetriou also orally advised the council members regarding various options they might pursue

with regard to LaChance's employment. Notably, Demetriou's advice included the following remarks:

[I]f you're going to fire him and you're going to make a decision that he can be fired for just cause, it would be our law firm's recommendation that he be taken off administrative leave, be put back on the job and then notified that thirty days after going back to work that he is going to be fired for just cause and I feel it would be only fair to the citizens of the community and to Mr. La Chance [sic] that if he is to be fired for just cause that specifics be given as to what he did that constituted mis-conduct [sic] in office. . . . Now, many employers when faced with this situation, take the position that even if I don't have enough now, I know down the road I want to fire him. So, lets [sic] get him back to work, put demands on him, give him restrictions, give him guidance and if he doesn't perform then he will be well advised of what he was supposed to do, he'll be award [sic] that he hasn't done it and then when he's gone he has no recourse, he can sue but he probably won't win.

In addition to providing strictly legal advice at this closed session, Demetriou advised the council regarding bargaining positions that it might take in its negotiations with LaChance. Demetriou also appeared to present his personal views regarding some aspects of the underlying controversy involving LaChance, beyond the applicable legal considerations. For example, Demetriou advised the council:

If a city manager down the road sees that you can be let go for small minded reasons, they ain't gonna come here and then you'll have to try to promote from within. Not to say you don't have qualified people here in your own home town that can do the job.

Defendants and Miller also engaged in discussion of LaChance's past job performance and, in essence, made specific or general comments about actions by

LaChance that they regarded as inappropriate conduct by a city manager. After indicating that Miller was the only council member at the closed session who was on the council when LaChance was hired, Whitney asked Miller whether he remembered "anything about just cause," to which Miller replied "[n]ot one thing."

Defendants also discussed whether they should decide to fire LaChance for "just cause" or agree to "buy out" LaChance. This discussion included statements by defendants regarding settlement terms that they would offer to LaChance. It is evident from the transcript that Demetriou left the room and then returned at certain points. On returning, he advised the council of discussions that he said he had with Humphreys. There was also some discussion by Whitney and Fyvie regarding Fyvie's expression of the view that provisions of the city charter regarding the power of the city manager should be changed. Defendants also discussed personal matters and engaged in "small talk" that could not reasonably be considered as relating to city business; it appears that much of this transpired while Demetriou was out of the room. Eventually, defendants agreed that they would return to an open session of the council and pass motions to take LaChance off administrative leave, to return him to his position as city manager, and to return Walker to his prior position.

Thereafter, defendants and Miller returned to the open session of the council where they voted in favor of successful motions to remove LaChance from administrative leave, to return him to his position as

city manager, and to end Walker's service as temporary city manager.[9]

## II. VIOLATIONS OF THE OMA

The OMA provides that a public body, when making a decision effectuating public policy, must make the decision at an open meeting, unless there is an applicable exception. MCL 15.263(1), (2), and (3); MSA 4.1800(13)(1), (2), and (3). Therefore, in order to resolve this issue, we must determine (1) whether the council acted as a "public body," (2) whether there was a "meeting" of a public body, (3) whether a "decision" effectuating public policy was made by the council, and (4) whether any statutory exceptions are applicable. In making these determinations, we note that the "fundamental purpose" of statutory construction is to "assist the court in discovering and giving effect to the intent of the Legislature." *In re Certified Question*, 433 Mich 710, 722; 449 NW2d 660 (1989). In order to effectuate the legislative intent regarding the OMA—facilitating public access to governmental decision making—the statute should be broadly interpreted and its exemptions strictly construed. *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 223; 507 NW2d 422 (1993) (*Booth*). A public body has the burden of proving that an exemption exists. *Id.*

### A. PUBLIC BODIES

The OMA defines the term "public body" to include a "board, commission, committee, subcommittee, authority, or council, which is empowered by state

---

[9] Notably, LaChance testified that he was discharged as city manager on "January 11th," presumably meaning January 11, 1993.

constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . ." MCL 15.262(a); MSA 4.1800(12)(a). Thus, "a key determination of the OMA's applicability is whether the body in question exercises governmental or proprietary authority." *Booth, supra* at 225. If an entity is a public body, its meetings (except those falling within a statutory exception) must be open to the public and held in a place available to the general public. MCL 15.263(1); MSA 4.1800(13)(1). Similarly, its decisions must be made at a meeting open to the public, and all deliberations of a quorum of the public body must take place at a meeting open to the public. MCL 15.263(2) and (3); MSA 4.1800(13)(2) and (3). Unquestionably, the council is a public body.

### B. MEETINGS

According to portions of a tape recording of the open session of the December 9, 1992, council meeting, a motion was passed at that session with defendants all voting for the motion "that we go into executive session for purposes of discussing the city manager's position." Before the vote on the motion, in response to a question from council member Seney, "This is for negotiations, or is this for the city manager?," Fyvie responded, "Whatever the discussion leads to within the city manager's position. I think that clarifies it." There was testimony indicating that thereafter defendants and Miller left the room where the open council meeting was being conducted and met in a closed room. The OMA defines a "meeting" as "the convening of a public body at which a quorum is present for the purpose of deliberating toward or ren-

dering a decision on a public policy." MCL 15.262(b); MSA 4.1800(12)(b). The three defendants themselves constituted a quorum of the council. Certainly, in considering what to do with regard to the city manager position, the council was deliberating toward a decision on public policy. In *Booth, supra* at 225, the Michigan Supreme Court observed that "[t]he selection of a university president is one of the [Board of Regents'] most important exercises of governmental authority." Similarly, we regard the decisions of a city council regarding the hiring or retention of a city manager to be among its most important exercises of governmental authority. Thus, deliberations of the council regarding such decisions constituted a meeting under the OMA.

### C. DECISIONS

The OMA defines a "decision" as "a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy." MCL 15.262(d); MSA 4.1800(12)(d). Defendants, who constituted a quorum of the council, agreed at the closed session at issue to return to an open session of the council and to vote to pass motions to remove LaChance from administrative leave, to return him to his position as city manager, and to end Walker's service as temporary city manager. These were decisions on matters of public policy that should have been made at an open meeting. Instead, however, the council made these decisions in private. The formal votes in an open session of the council were, practically speaking, a "fait

accompli" by the time that they were conducted. Cf. *Booth, supra* at 228-229 (secretive decision-making process in selecting a university president in which only the final step of formally selecting the successful candidate was conducted in public involved closed-door decisions under the OMA).

### D. EXCEPTIONS

#### (1) THE "RULE OF LENITY"

With regard to whether exemptions from the open meeting requirement contained in the OMA were applicable to the alleged violation of the OMA underlying defendants' convictions, defendants invoke the "rule of lenity" as requiring that any ambiguities in the OMA, when used as a penal statute, be construed in a manner favorable to an accused. See *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997) (under the "rule of lenity," courts should mitigate punishment when the punishment in a criminal statute is unclear). However, the exemptions in the OMA are to be strictly construed. *Booth, supra* at 230; *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 221 Mich App 103, 116; 561 NW2d 433 (1997). It would not be sensible for the same provision in the OMA to have one meaning in a civil case and another in a criminal case. Thus, we conclude that the rule of lenity does not apply to construction of the exemptions contained in the OMA.[10] Rather, we strictly construe the

---

[10] Notably, the rule of lenity has been held inapplicable with regard to certain other criminal law provisions. The Michigan Supreme Court has held that the rule of lenity is inapplicable to a consecutive sentencing provision contained in the Public Health Code because of a statutory provision requiring the provisions of that code to be liberally construed for the protection of the health, safety, and welfare of the people of the state. *Denio, supra* at 699-700. See also *Stajos v City of Lansing*, 221 Mich App

exemptions contained in the OMA for purposes of determining whether there was an actual violation of the OMA.

### (2) EXEMPT MATERIAL

Defendants invoke the OMA "exempt-material" provision, MCL 15.268(h); MSA 4.1800(18)(h), that allows a public body to meet in closed session "[t]o consider material exempt from discussion or disclosure by state or federal statute." In making this argument, defendants rely on two provisions of the state Freedom of Information Act (FOIA), MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*, as providing the exemptions for material discussed at the closed session at issue.

### (a) ATTORNEY-CLIENT PRIVILEGE

FIRST, DEFENDANTS INVOKE THE FOIA "attorney-client-privilege" exemption, MCL 15.243(1)(h); MSA 4.1801(13)(1)(h), that provides that a public body may exempt from disclosure as a public record, "[i]nformation or records subject to the attorney-client privilege." Defendants argue that at the December 9, 1992, closed session they were not violating the OMA because they were considering material presented to the council under the attorney-client privilege, specifically letters written to the council by attorney Demetriou.[11] However, this Court has previ-

---

223, 227-229; 561 NW2d 116 (1997) (rule of lenity inapplicable to penal statute regarding use or sale of fireworks and similar materials).

[11] Defendants have referenced certain letters authored by Demetriou and addressed to the council in their brief. Notably, one of these letters was dated December 8, 1992, the day before the December 9, 1992, council meeting. During oral argument, defendants' counsel acknowledged that the December 8, 1992, letter was not received by defendants before the December 9, 1992, meeting. Accordingly, reviewing the contents of this letter simply could not have been a basis for the decision by defendants,

ously rejected the position that the OMA exempt-material exemption allows a public body to meet in closed session on any matter within the attorney-client privilege:

> The issue which is preliminary to all other issues raised on appeal is whether the trial court construed § 8(h) of the OMA [the exempt-material exemption] too narrowly in concluding that the OMA only authorized closed sessions to discuss written legal opinions. The city council argues that § 8(h) should be construed as authorizing closed sessions on any matters shielded by the common law attorney-client privilege. We disagree. [*Booth Newspapers, Inc v Wyoming City Council*, 168 Mich App 459, 466; 425 NW2d 695 (1988) (*Booth Newspapers v Wyoming*).]

Further, closed sessions may not be held to receive oral legal opinions. *Id.* at 468-469. In this case, the transcript of the closed session at issue shows that Demetriou provided oral legal opinions to the council. This did not trigger the OMA exempt-material exemption.

Moreover, this Court described the type of discussion about a written legal opinion that is permissible at a closed meeting of a public body:

> We . . . hold that § 8(h) of the OMA [the exempt-material exemption] authorizes closed sessions to discuss matters which are exempt from disclosure or discussion by a statute (such as the FOIA), or which are reasonably related thereto. To effectuate the clear legislative intent in the OMA to promote openness and accountability, the scope of the discussion in closed session must legitimately relate to legal matters, *and not bargaining, economics, or other tangential nonlegal matters.* Because the trial court correctly con-

---

as a majority of the council, to go into the closed session on December 9, 1992.

sidered these limitations, we find no legal error in its inter-
pretation of the OMA as it applies to this case. [*Booth News-
papers v Wyoming, supra* at 468. Emphasis added.]

It would be illogical to construe the attorney-client-
privilege exemption as authorizing a public body to
evade the open meeting requirements of the OMA
merely by involving a written opinion from an attor-
ney in the substantive discussion of a matter of public
policy for which no other exemption in the OMA would
allow a closed meeting. See *Gross v General Motors
Corp*, 448 Mich 147, 164; 528 NW2d 707 (1995) (stat-
utes must be construed to prevent illogical or absurd
results). To avoid this illogical result, we conclude
that proper discussion of a written legal opinion at a
closed meeting is, with regard to the attorney-client
privilege, limited to the meaning of any strictly legal
advice presented in the written opinion.[12] The attor-
ney-client-privilege exemption does not extend to
matters other than the provision of strictly legal
advice.

Thus, receipt of the documents prepared by Deme-
triou and discussion of their meaning by members of
the council may have been protected by the attorney-
client-privilege exemption with regard to the advice
contained in those documents that can be categorized
as strictly legal advice. However, defendants' further
discussion about the city manager position, even if
based in whole or in part on the material from Deme-
triou, was outside the attorney-client-privilege exemp-
tion. Clearly, the discussion at the closed session

---

[12] Of course, it is conceivable that in some situations discussion about
"nonlegal" matters somewhat related to a written legal opinion at a closed
meeting would be permissible under an exemption in the OMA on a basis
apart from the attorney-client privilege.

went far beyond consideration of any written legal opinions. It included substantial discussion of the position that the council should take in bargaining with LaChance for his resignation, as well as some discussion of tangentially related matters of city operations. Further, the motion passed by the council to go into this closed session explicitly referred to it as being for purposes of negotiations, a purpose beyond the discussion of a written legal opinion. Accordingly, we conclude that defendants went beyond the scope of the attorney-client-privilege exemption by voting to hold, and actually participating in, the closed session on December 9, 1992, at which they discussed "nonlegal" matters related to the city manager position.

### (b) OTHER PRIVILEGE

Second, defendants invoke the "other-privilege" exemption, MCL 15.243(1)(i); MSA 4.1801(13)(1)(i). As in effect at the time of the alleged offense on December 9, 1992, this provision contained an FOIA exemption from disclosure for "[i]nformation or records subject to the physician-patient, psychologist-patient, minister, priest or Christian science practitioner, or other privilege recognized by statute or court rule."[13]

On the basis of the other-privilege exemption, defendants argue that the work product rule provided by MCR 2.302(B)(3) authorized the closed meeting at issue. MCR 2.302(B)(3)(a) provides:

---

[13] Although subsequent amendments have changed the wording in the current version of § 13(1)(i), it is substantively identical in providing an exemption for "[i]nformation or records subject to the physician-patient privilege, the psychologist-patient privilege, the minister, priest, or Christian Science practitioner privilege, or other privilege recognized by statute or court rule."

> Subject to the provisions of subrule (B)(4) [regarding expert witnesses], a party may obtain discovery of documents and tangible things otherwise discoverable under subrule (B)(1) and prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only on a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

It is illogical to provide a greater allowance for closed-door discussion of a matter by a public body on the basis of receipt of a written document within the scope of the work product privilege from an attorney than there would be under the attorney-client privilege. *Gross, supra.* If we accepted such a position, a public body could, with regard to a matter that it would otherwise be required to discuss at an open meeting, avoid that requirement simply by having a report on that matter prepared by an attorney and then, at a closed meeting, having a discussion of that report. A legislative purpose of the enactment of the OMA was "to promote a new era in governmental accountability." *Booth, supra* at 222. We do not countenance the use of strained legalisms or evasions to undermine the intent of the OMA to promote open and responsible government. *Id.* at 229. Accordingly, we conclude that the other-privilege exemption did not authorize the closed meeting at issue on the basis of the work product privilege. The meeting clearly went

well beyond discussing Demetriou's written legal opinions.

### (3) SPECIFIC PENDING LITIGATION

Defendants invoke the OMA's "specific-pending-litigation" exemption, MCL 15.268(e); MSA 4.1800(18)(e). Section 8(e), as in effect in its current form on December 9, 1992, provides that a public body may meet in closed session:

> To consult with its attorney regarding trial or settlement strategy in connection with specific pending litigation, but only if an open meeting would have a detrimental financial effect on the litigating or settlement position of the public body.

Defendants attempt to justify the closed meeting at issue under the OMA specific-pending-litigation exemption because it allegedly involved negotiations toward a settlement with LaChance. Defendants state that "[t]he closed meeting of December 9, 1992 falls within a liberal interpretation of the phrase 'pending litigation.'" However, we do not construe the exemptions provided by the OMA liberally. Rather, we construe them strictly. *Booth, supra; Federated Publications, supra.* The OMA does not define the term "specific pending litigation." Thus, to the extent that the phrase "specific pending litigation" in the pertinent OMA exemption may be ambiguous, we are to adopt the reasonable construction that provides the narrowest opportunity for closed meetings to be conducted.

Defendants forthrightly acknowledge that certain definitions of the terms "pending" and "litigation" "include a reference to some type of present court proceeding." We agree. Indeed, in our view, "litigation" is most naturally taken as referring to proceed-

ings in a case filed in a court of law. Accordingly, "pending litigation" most naturally refers to a case that actually has been filed and, thus, is "pending." The evidence in this case indicates that LaChance had not filed a lawsuit against the city of Vassar or any entity within the city government. Rather, LaChance was merely contemplating such a lawsuit if he were to be discharged as city manager.

Defendants argue that the decision in *Michigan Millers Mut Ins Co v Bronson Plating Co*, 445 Mich 558; 519 NW2d 864 (1994), supports their position regarding the OMA's specific-pending-litigation exemption. *Bronson* involved multiple insurance companies that contended they were not obliged to provide representation to an insured company under insurance policies providing they had a " 'duty to defend any *suit* against the insured seeking damages on account of . . . bodily injury or property damage.' " *Id.* at 563 (emphasis in original). In *Bronson*, the federal Environmental Protection Agency (EPA) notified the insured company that it was potentially liable in connection with a contaminated site. *Id.* at 562. The Michigan Supreme Court determined that the term "suit" as used in the insurance policies in *Bronson* was "ambiguous and capable of application to legal proceedings initiated in other than a traditional court setting." *Id.* at 571. The Court further determined that the letter from the EPA initiated a legal proceeding that was "the functional equivalent of a suit brought in a court of law" and that the insurers were obligated to defend that "suit" under the insurance policies. *Id.* at 575. The Court stated:

> As the legal community and state and federal legislatures struggle to relieve the ever-increasing burdens on our

> courts and the constantly rising costs of *litigation,* a gravi-
> tation is evident toward *less formal and more expeditious
> means of dispute resolution. [Id.* at 570. Emphasis added.]

Active participation with an opponent in some type of alternative dispute resolution mechanism without a suit having been filed in a court of law is therefore to be considered "litigation." In this case no one initiated such proceedings regarding LaChance's treatment by the council. Rather, there were settlement negotiations between LaChance and some or all of the defendants, who were acting as members of the council. Under any reasonable interpretation of the term "litigation," that term does not extend to mere settlement negotiations before the institution of any type of proceeding in which a judge, one or more arbitrators, or a similar third party or body would be expected, in the absence of a settlement, to ultimately render a decision in the case.

### III. THE JURY INSTRUCTIONS

We next address the issue whether the district court's instructions to the jury constituted error requiring reversal. Defendants allege that the jury instructions allowed the jury to find that defendants committed the crimes of intentionally violating the OMA and, by derivation, conspiracy to intentionally violate the OMA with a less culpable mental state than was required for conviction. We agree. Defendants preserved this issue by objecting to the jury instructions at issue. We review jury instructions in their entirety to determine if there is error requiring reversal. *People v McFall,* 224 Mich App 403, 412; 569 NW2d 828 (1997). Even if jury instructions are imperfect, there is no error if they fairly presented the

issues to be tried and sufficiently protected a defendant's rights. *Id.* at 412-413.

MCL 15.272(1); MSA 4.1800(22)(1), the provision of the OMA that the jury convicted defendants of violating, provides:

> A public official who *intentionally violates* this act is guilty of a misdemeanor punishable by a fine of not more than $1,000.00. [Emphasis added.]

There has not been a prior published opinion of this Court or the Michigan Supreme Court articulating the elements of the crime of intentionally violating the OMA. However, if statutory language is clear, then the statute must be enforced as written. *Sanders v Delton Kellogg Schools*, 453 Mich 483; 556 NW2d 467 (1996). Thus, on the basis of the plain language of § 12(1), we conclude that the crime of intentionally violating the OMA consists of three elements: (1) the defendant is a member of a public body,[14] (2) the defendant actually violated the OMA in some fashion, and (3) the defendant intended to violate the OMA.

The district court[15] instructed the jury as follows with regard to the mental state necessary for the crime of intentionally violating the OMA:

> Guilty knowledge and intent cannot be established by demonstrating merely negligence or even foolishness on the part of a defendant.

---

[14] Although only a public official may directly commit the crime of intentionally violating the OMA, we point out that this would not preclude the conviction of a nonpublic official of this crime based on aiding and abetting in an appropriate case where the nonpublic official intentionally or knowingly aided a public official in intentionally violating the OMA. See, e.g., *People v Partridge*, 211 Mich App 239, 240; 535 NW2d 251 (1995).

[15] The district court did say, outside the presence of the jury, that intentionally violating the OMA is a specific intent crime.

However, it is not necessary the prosecution prove to a certainty that the defendant knew [sic] and intended to violate the Open Meetings Act.

Such knowledge and intent is established *if the defendant was aware of a high probability* that he was violating the Open Meetings Act unless the defendant actually believed in good faith that he was not violating the Open Meetings Act.

*Knowledge and intent may be inferred from circumstances that would convince a man of ordinary intelligence that he was violating the Open Meetings Act.* The element of knowledge and intent may be satisfied by proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him.

Thus, *if you find that a defendant acted in a reckless disregard of whether he was violating the Open Meetings Act and with a conscious purpose to avoid learning the truth,* the requirements of intent and knowledge would be satisfied unless you find the defendant actually believed that he was not violating the Open Meetings Act.

You should scrutinize the entire conduct of the defendant at or near the time the offenses are alleged to have been committed.

*A defendant cannot close his eyes to the obvious risk he is engaging in criminal conduct.* [Emphasis added.]

Defendants contend that the crime of intentionally violating the OMA is a specific intent crime. We agree. A specific intent crime requires a particular criminal intent beyond the act done, while a general intent crime requires merely the intent to perform a proscribed physical act. *People v Lardie,* 452 Mich 231, 240; 551 NW2d 656 (1996); *People v Gould,* 225 Mich App 79, 83; 570 NW2d 140 (1997).[16]

---

[16] We note that there are also strict liability crimes for which the prosecution only needs to prove that the act was performed regardless of what the actor knew. See *Lardie, supra* at 240-241. The crime of intentionally

In determining whether a crime is a specific intent crime, we first look to the intent of the Legislature. *Id.* The first criterion in determining legislative intent is the specific language of the statute, because the Legislature is presumed to have intended the meaning that is plainly expressed. *Id.* A plain reading of the criminal provision of the OMA at issue dictates a conclusion that the crime of intentionally violating the OMA is a specific intent crime. Applying rules of grammar and common usage, the adverb "intentionally" as used in this statute modifies the term "violates." *Deur v Newaygo Sheriff,* 420 Mich 440, 444-446; 362 NW2d 698 (1984). The criminal provision plainly states that this offense requires an *intentional* violation of the OMA. Thus, the mere act of violating the OMA, without intending to do so, does not constitute the crime of intentionally violating the OMA. It follows that intentionally violating the OMA is a specific intent crime because it requires a criminal intent beyond merely voluntarily committing a proscribed physical act. *Lardie, supra; Gould, supra.*[17]

To commit a specific intent crime, " 'an offender would have to subjectively desire or know that the

violating the OMA with its express requirement that an actor "intentionally" commit a violation is certainly not a strict liability crime.

[17] We note that this conclusion is further supported by the axiom that, in construing a statute, a court should presume that every word has some meaning and should avoid any construction rendering a statute or any part of it surplusage or nugatory. *Gould, supra* at 83. If we concluded that the crime of intentionally violating the OMA could be established merely by voluntarily committing an act that actually violated the OMA, we would largely read the term "intentionally" (as it modifies "violates") out of the statutory provision. Further, this Court in *Gould* determined that the terms "intentionally" and "knowingly" as used in the statute considered in that case were synonymous and that this Court has repeatedly concluded that a crime that is required to be committed "knowingly" is a specific intent crime. *Id.* at 84-85.

prohibited result will occur . . . .' " *Gould, supra* at 85, quoting *People v Lerma*, 66 Mich App 566, 569; 239 NW2d 424 (1976). Thus, as an essential element of the crime of intentionally violating the OMA, an offender must have a subjective desire to violate the OMA or knowledge that the offender is committing an act violative of the OMA. However, the jury instructions given by the district court allowed a finding of the requisite intent element merely if a defendant "was aware of a high probability that he was violating the [OMA] unless the defendant actually believed in good faith that he was not violating the [OMA]."

This was a fundamental flaw that may have allowed conviction based in part on mere disregard of a highly probable risk of violating the OMA. The error could well have been reinforced by the district court's comment that a defendant "cannot close his eyes to the obvious risk he is engaging in criminal conduct." This comment suggested that mere knowledge of a risk of violating the OMA would suffice to establish the requisite intent element.

In *People v Beaudin*, 417 Mich 570, 575; 339 NW2d 461 (1983), the Michigan Supreme Court stated with regard to the specific intent crime at issue in that case:

> Performance of the physical act proscribed in the statute is not enough to sustain a conviction. The act must be coincident with an intent to bring about the particular result the statute seeks to prohibit.

Thus, under Michigan law, no lesser amount of recklessness or even deliberate ignorance suffices to replace the requisite specific intent that is essential to commit a specific intent crime. We note that the dis-

trict court apparently based its instruction, at least in part, on the decision of the en banc federal Ninth Circuit Court of Appeals in *United States v Jewell*, 532 F2d 697 (CA 9, 1976). However, we conclude that Michigan law clearly provides that no degree of recklessness or even deliberate ignorance suffices to establish the intent necessary to establish a specific intent crime.

The mental state with which defendants acted in convening the closed session of the council on December 9, 1992, was a closely drawn issue at trial. While the prosecution presented evidence that defendants were told that going into this closed session would violate the OMA, there was also evidence tending to support a conclusion that defendants may not have believed they were violating the OMA in convening the closed session.[18] There is a substantial risk that the district court's erroneous jury instructions regarding intent contributed to defendants' convictions of intentionally violating the OMA. Because the jury instructions used in this case allowed defendants to be convicted of intentionally violating the OMA on the basis of a mental state substantially less than that necessary to properly establish the intent element of that offense, we conclude that the jury instructions did not fairly present the issues to be tried or adequately protect defendants' rights. *McFall, supra* at 412-413. Thus, we hold that the erroneous jury instructions regarding intent require reversal of the conviction of intentionally violating the OMA entered against each defendant.

---

[18] For example, Demetriou testified that, during a meeting on November 19, 1992, Whitney asked him whether "they could go into a closed session to discuss employment matters" and that Demetriou said "[s]ure."

The jury also convicted defendants Whitney and Fyvie of conspiracy to commit the crime of intentionally violating the OMA. To establish a conspiracy, there must be "evidence of specific intent to combine with others to accomplish an illegal objective." *People v Blume*, 443 Mich 476, 481; 505 NW2d 843 (1993); see also *People v Justice (After Remand)*, 454 Mich 334, 337; 562 NW2d 652 (1997) (to bind over the defendant on two counts of conspiracy there must be probable cause "to believe that defendant and the coconspirators shared the specific intent to accomplish the substantive offenses charged"). The alleged illegal objective in this case was conduct constituting the crime of intentionally violating the OMA. On the basis of the jury instructions, the jury may well have convicted Whitney and Fyvie of the conspiracy charges on the basis of a finding that they jointly intended to go into the closed session at issue on December 9, 1992, in reckless disregard of whether they were violating the OMA rather than with the requisite actual knowledge or specific desire to violate the OMA. Thus, we also reverse the conspiracy convictions entered against Whitney and Fyvie.

We reverse the convictions in this case and remand the mater to the district court for a new trial with regard to those alleged offenses. We do not retain jurisdiction.