# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

THE DETROIT NEWS, INC v INDEPENDENT CITIZENS REDISTRICTING COMMISSION

Docket No. 163823. Argued December 15, 2021. Decided December 20, 2021.

The Detroit News, Inc., Detroit Free Press, Inc., and others brought an original action in the Michigan Supreme Court against the Independent Citizens Redistricting Commission, alleging that the commission violated Const 1963, art 4, § 6 by withholding certain data and supporting materials used to develop its proposed redistricting plans and by conducting business during a closed meeting. Plaintiffs sought (1) a declaratory judgment that Article 4, § 6 requires the commission to disclose all supporting materials that it uses to develop its plans, (2) a writ of mandamus compelling the release of supporting materials withheld in violation of Article 4, § 6, (3) a declaratory judgment that Article 4, § 6 requires the commission to conduct all of its business in open meetings, and (4) a writ of mandamus requiring the release of the recording of a closed-session meeting and requiring that all future business meetings be open to the public. The Court ordered and heard oral argument on the complaint. ___ Mich ___ (2021).

In an opinion by Justice VIVIANO, joined by Justices ZAHRA, BERNSTEIN, and CLEMENT, the Supreme Court *held*:

The commission's October 27, 2021 closed-session meeting violated the requirement in Const 1963, art 4, § 6(10) that the commission conduct all of its business at open meetings. The discussion that occurred at that meeting involved the content and development of the maps and thus constituted the business of the commission. Further, the commission was required by Const 1963, art 4, § 6(9) to publish seven of the memoranda sought by plaintiffs. Those seven memoranda constituted supporting materials used to develop the proposed redistricting plans because they concerned the content of the maps and the direct process by which the maps were developed. The remaining three memoranda that plaintiff sought were not supporting materials for purposes of Const 1963, art 4, § 6(9) because they did not directly involve either the substance of the maps or the mechanics for drawing the maps. The commission was ordered to produce the recording of the October 27 meeting and the seven memoranda that constituted supporting materials. All documents and other materials were required immediately to be turned over to plaintiffs and made public. The Clerk of the Court was directed to issue a judgment to this effect pursuant to MCR 7.315(C)(3).

1. In Michigan, privilege is governed by the common law, except as modified by statute or court rule. In general, the attorney-client privilege attaches to communications made to the attorney by the party or client, as legal adviser, and for the purpose of obtaining the attorney's legal advice and opinion relative to some legal right or obligation. Likewise, the roots of Michigan's work-product doctrine come from the common law. This doctrine protects materials prepared by an attorney in anticipation of litigation. It is generally sufficient if the prospect of litigation is identifiable, either because of the facts of the situation or the existence of pending claims. The commission grounded its assertions of privilege in the common law, but also noted various constitutional provisions that give it the power to retain counsel, suggesting that the common understanding of these provisions is that the commission retains the attorney-client privilege and any other general protections, such as those afforded by the work-product doctrine. However, nothing in Const 1963, art 4, § 6 refers to any attorney-client privilege or protections; rather, these are governed by the common law. Accordingly, they must give way to the Constitution to the extent they are "repugnant" to it, meaning "incompatible" or "inconsistent." To the extent that the common law would shield something the Constitution requires to be disclosed, there is a repugnance and the Constitution must prevail.

2. Under Const 1963, art 4, § 6(10), the commission is required to conduct all of its business at open meetings, and it must do so in a manner that invites wide public participation throughout the state, using technology to provide contemporaneous public observation and meaningful public participation in the redistricting process during all meetings and hearings. Because the actions of a public body are at issue, "business" is a term of art with a specialized meaning, specifically: "the matters that come before a deliberative assembly for its consideration and action, or for its information with a view to possible action in the future." The commission's core business is the development and adoption of redistricting plans, and the resulting maps must comply with certain legal requirements. The two memoranda discussed at the October 27 meeting were to ensure that the proposed maps complied with the Voting Rights Act, 52 USC 10101 *et seq*., which entails considerations such as the proportionality of minority-majority group districts to the group's share of the population and the history of voting-related discrimination in the state or subdivision. Legal advice on how to draw a map is akin to statistical advice on demographics or other expert counsel. Under Const 1963, art 4, § 6(5), the Legislature was required to appropriate funds sufficient to enable the commission to carry out its functions, operations, and activities, which included retaining independent, nonpartisan subject-matter experts and legal counsel, as well as any other activity necessary for the commission to conduct its business. Accordingly, the retention of experts and counsel was an "activity necessary for the commission to conduct its business" because adopting maps that comply with the law is a necessary part of the commission's business, and obtaining counsel's advice was necessary to that end. While such advice might otherwise be privileged as a communication from an attorney, any such privilege must yield to the requirement in Const 1963, art 4, § 6(10) that the commission "conduct all of its business at open meetings." Mere anticipation of likely litigation was not enough to overcome the constitutional mandate that business be conducted in the open, and allowing the simple prospect of litigation to shield the commission's discussions on how to make a map would threaten to swallow the open-meeting requirement altogether. Because the October 27 meeting at issue concerned the adoption of the plans and not any pending litigation, the subject of the meeting constituted the commission's business and therefore had to be conducted in an open session under Const 1963, art 4, § 6(10). Accordingly, disclosure of the recording of the meeting was required.

3. Under Const 1963, art 4, § 6(9), once the commission has developed at least one proposed redistricting plan for each type of district, the commission is required to publish the proposed redistricting plans and any data and supporting materials used to develop the plans. Plaintiffs contended that the 10 memoranda whose publication they sought constituted supporting materials used to develop the plans that were proposed on October 11, 2021, and later revised and published in November. In response, the commission contended that the memoranda all involved privileged communications seeking legal advice from its attorneys and thus did not constitute supporting materials, which the commission argued must be understood in the context of the associated term "data" and limited to purely factual information. However, the common quality of the terms "data" and "supporting materials" is that they are things used in the development of the maps, not that they limit the materials that must be disclosed to factual information as opposed to advice or opinion. The fact that some of the memoranda postdate the publication of the first proposed plans on October 11, 2021, does not mean they cannot qualify as supporting materials, because the plans are subject to revision. Nonetheless, to fall within the publication requirement, the materials must "support" the development of a plan. To "support" the plan's development means "to hold up or serve as a foundation or prop for" the plans. Thus, there must be some connection between the material and the plan's development. Because the business of the commission is to develop and adopt redistricting plans, any materials related to the plans' substance would be supporting, as would a memorandum containing legal advice about how a district needs to be constructed in order to comply with the law. But the connection between the materials and the plan's development must not be too attenuated to justify the conclusion that the materials provided a foundation for, i.e., supported, the plan's development. In general, the further the materials stray from the content of the plan or the process by which that content was developed, the less likely it is that they can be said to support the plan's development. The first memorandum plaintiffs sought, from January 21, 2021, dealt with the individual interests and behavior of the commissioners themselves and had no direct bearing on the plans or how they were formed. The next two memoranda related to the action brought by the commission this past summer seeking to obtain approval to delay various deadlines imposed by the Constitution, which did not directly involve either the substance of the maps or the mechanics for drawing the maps. Consequently, these three memoranda did not constitute "supporting materials" and were not required to be published. However, the remaining seven memoranda—those from June 24, October 7, October 14, October 26, November 3, November 4, and November 7, 2021—all related to the core content of the maps or the immediate process by which that content was developed and were therefore "supporting materials." Accordingly, the commission was required to publish them under Const 1963, art 4, § 6(9).

Justice CLEMENT, concurring in part and dissenting in part, joined the majority opinion and its interpretation of what qualifies as the "business" of the commission and what qualifies as "supporting material" to proposed maps. As a result, she concurred with the majority that three of the memoranda did not qualify as supporting material and that the remaining seven memoranda did qualify as supporting material, for the reasons stated. Notwithstanding her agreement that three of the memoranda were not supporting material, she would have ordered their disclosure because concealing them was incompatible with the commission's obligation to conduct business at open meetings pursuant to Const 1963, art 4, § 6(10), which also provided an independent basis for ordering the disclosure of the other seven memoranda. She also agreed that the commission must disclose the recording of the October 27, 2021 meeting.

Justice WELCH, joined by Chief Justice MCCORMACK and Justice CAVANAGH, dissenting, stated that the commission was guaranteed legal representation by Const 1963, art 4, § 6(4), and that this representation necessarily includes the common-law attorney-client and work-product privileges. She stated that if the voters had meant to deprive the commission of this fundamental part of legal representation, they would have said so explicitly in Const 1963, art 4, § 6. She also observed that, until now, no court in a state that has an independent redistricting commission had decided that its commission's right to legal representation encompasses something less than what would be enjoyed by any other public body. She noted that it would have been possible to review the materials at issue *in camera* to ensure that the commission was properly asserting the attorney-client privilege, and she would have taken that step in this case. She also disagreed with the majority's conclusion that Const 1963, art 4, § 6(9)—which requires the commission to publish the proposed redistricting plans and any data and supporting materials used to develop the plans—requires the disclosure of privileged documents, because § 6(9) explicitly defines what materials the commission must provide when publishing its proposed plans: namely, such census data as is necessary to accurately describe the plan and verify the population of each district and a map and legal description that include the political subdivisions, man-made features, and natural features that form the boundaries of the districts. Likewise, she noted that § 6(14)(b), which sets forth what is required when the commission is prepared to enter the 45-day comment period before voting to adopt a plan, also specifies what materials must be publicly available, and it does not include privileged material. She concluded that the Constitution unambiguously affords the commission legal representation and, by depriving the commission of the common-law right to attorney-client and work-product privileges that are generally understood as defining an attorney-client relationship, the majority put its own views above those of the voters, who wanted the commission to draw fair and legal maps and knew that legal representation was important to do so successfully.

OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED December 20, 2021

S T A T E   O F   M I C H I G A N

SUPREME COURT

THE DETROIT NEWS, INC., DETROIT
FREE PRESS, INC., THE CENTER FOR
MICHIGAN, INC., also known as BRIDGE
MICHIGAN, MICHIGAN PRESS
ASSOCIATION, and LISA McGRAW,

       Plaintiffs,

v                                              No. 163823

INDEPENDENT CITIZENS
REDISTRICTING COMMISSION,

       Defendant.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

In 2018, the voters of Michigan chose to vest responsibility for redistricting in an independent body. That body they created, the Independent Citizens Redistricting Commission (the Commission), consists of 13 commissioners generally selected on a random basis from a pool of applicants. Const 1963, art 4, § 6(2). This marked a departure

from the prevailing mode of redistricting, which had been done for decades by the Legislature. See *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 87-88; 921 NW2d 247 (2018) (*CPMC*). In placing the redistricting power with an independent body of unelected officials, the voters chose to ring the body with transparency requirements, forcing much, if not all, of the Commission's work into the daylight.

The present case concerns the scope of these provisions and how they relate to any privileges and protections that the Commission might have with respect to its communications with its attorneys. Plaintiffs are a group of news organizations and press seeking to enforce the transparency requirements.[1] In particular, they seek production of a recording from the Commission's closed-session meeting on October 27 of this year, contending that holding the meeting in secret violated the constitutional mandate that the Commission "conduct all of its business at open meetings." Const 1963, art 4, § 6(10). We agree. From the titles of the memoranda discussed at that meeting, it is beyond dispute that the meeting involved the development of the redistricting maps. Such work is unquestionably within the Commission's core "business," and it therefore needed to be conducted in the open. Plaintiffs also request disclosure of 10 memoranda that the Commission claims are privileged attorney-client communications. We conclude that, in light of the constitutional text requiring disclosure of materials that support development of redistricting plans, seven of the memoranda must be published as "supporting materials"

---

[1] In addition to the individual news outlets, plaintiffs include the Michigan Press Association, the official trade association for various newspapers in Michigan, and its executive director.

2

under Const 1963, art 4, § 6(9). The other three are not "supporting materials" and therefore need not be disclosed.

## I. FACTS AND PROCEDURAL HISTORY

On October 15, 2020, the Secretary of State convened the Commission. The Commission is charged with drawing redistricting plans for our state and federal legislative offices: "The commission shall adopt a redistricting plan for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts." Const 1963, art 4, § 6(1). Pursuant to that duty, the Commission must consult with and provide information to the public.

Before any drafting begins, the Commission must hold at least 10 public hearings and receive materials from the public. Const 1963, art 4, § 6(8). Then, "[a]fter developing at least one proposed redistricting plan for each type of district, the commission shall publish the proposed redistricting plans and any data and supporting materials used to develop the plans." Const 1963, art 4, § 6(9). The first proposed plans were published on October 11, 2021. In compliance with Const 1963, art 4, § 6(9), the Commission held five public hearings to consider proposed plans. The next relevant step in the process was to publish proposed plans that the Commission will ultimately vote on. Const 1963, art 4, § 6(14)(b). That occurred on November 12, 2021.[2]

_____

[2] It is worth noting that these dates do not conform to the constitutionally imposed deadlines for the proposal and adoption of plans. Const 1963, art 4, § 6(7). The Commission filed a previous suit requesting authority to disregard these deadlines because of the delay in obtaining federal census data, but this Court denied the request because we were not persuaded the requested relief should be granted. *In re Independent Citizens Redistricting Comm*, ___ Mich ___; 961 NW2d 211 (2021).

3

In the meantime, however, the Commission voted to enter a closed-session discussion on October 27, 2021, to consider two memoranda. The first was dated October 14, 2021, and entitled "Voting Rights Act." The Commission, in this Court, has described the memorandum as follows: "Attorney-client communication and attorney work product providing case law interpretation and legal advice with associated litigation risks related to certain redistricting criteria." The second memorandum, dated October 26, 2021, bore the title "The History of Discrimination in the State of Michigan and its Influence on Voting," and it has been described by the Commission as follows:

> Attorney-client communication and attorney work product providing case law interpretation and legal advice with associated litigation risk related to certain redistricting criteria. Sets forth research, interpretation and legal advice regarding threshold issues required to be met by Plaintiffs in Voting Rights Act challenges.

Plaintiffs subsequently requested these memoranda from the Commission, along with a recording of the closed-session meeting. In the process of communicating with the Commission, plaintiffs learned that at least eight other memoranda had been considered by the Commission but were never disclosed to the public. The Commission asserted that these memoranda and the October 27 meeting were privileged and confidential communications from the Commission's attorneys.

As these efforts were ongoing, a bipartisan pair of legislators asked the Attorney General to produce an opinion on whether the Commission violated the Constitution by conducting a closed session. The Attorney General concluded that the meeting needed to be open under Const 1963, art 4, § 6(10), and that the memoranda considered at the meeting

4

needed to be published under Const 1963, art 4, § 6(9). OAG, 2021, No. 7,317 (Nov 22, 2021).

Unfazed by the Attorney General's analysis, the Commission continued to deny plaintiffs' requests. Plaintiffs then filed this emergency action in our Court, invoking our original jurisdiction under Const 1963, art 4, § 6(19). In it, they request the 10 memoranda and a recording of the closed meeting. The Commission claims these materials are shielded from the public as privileged. We have heard arguments, and the case is now ready for resolution.

## II. ANALYSIS

Answering the question presented by this case—whether the requested materials are privileged—requires a close analysis of the constitutional text to determine whether the Constitution requires a public meeting or disclosure. If it does, then, as discussed more below, any privilege or protection must give way.

### A. ATTORNEY-CLIENT PRIVILEGE AND WORK-PRODUCT DOCTRINE

In determining how the Constitution limits the attorney-client privilege or protection afforded by the work-product doctrine, it is necessary to begin by briefly considering the source and scope of those privileges and protections. In Michigan, "[p]rivilege is governed by the common law, except as modified by statute or court rule." MRE 501. In general, the attorney-client privilege attaches to communications "made to the attorney by the party, or client, as his legal adviser, and for the purpose of obtaining his legal advice and opinion, relative to some legal right or obligation." *Alderman v People*, 4 Mich 414, 423 (1857). Likewise, the roots of our work-product doctrine come from the common law. See

5

*D'Alessandro Contracting Group, LLC v Wright*, 308 Mich App 71, 84 n 5; 862 NW2d 466 (2014). The doctrine protects materials prepared by an attorney "in anticipation of litigation . . . ." *Id*. at 77. "It is generally sufficient if the prospect of litigation is identifiable, either because of the facts of the situation or the existence of pending claims." *People v Gilmore*, 222 Mich App 442, 455; 564 NW2d 158 (1997).

The Commission appears to recognize these rules and ground its assertions of privilege in the common law. But the Commission also points to various constitutional provisions that give it the power to retain counsel, suggesting that the common understanding of these provisions is that the Commission retains the attorney-client privilege and any other general protections, such as those afforded by the work-product doctrine.[3]

It is true that we interpret the Constitution by the ordinary meaning of its terms, i.e., the meaning that would be commonly understood by the ratifiers at the time of ratification. *CPMC*, 503 Mich at 61. But that interpretive principle does not lead to the conclusion the Commission urges. For one thing, nothing in the text itself makes reference to any attorney-client privilege or protections. A reader at the time of ratification would need to infer from the fact that the Constitution allows the Commission to obtain legal representation that the Constitution also incorporates a particular vision of the privileges

---

[3] See Const 1963, art 4, § 6(4) ("The commission shall have procurement and contracting authority and may hire staff and consultants for the purposes of this section, including legal representation."); Const 1963, art 4, § 6(5) (noting that the Legislature must appropriate funds for "legal counsel" for the Commission); Const 1963, art 4, § 6(6) (noting that the Commission has "legal standing to prosecute an action regarding the adequacy of resources provided for the operation of the commission, and to defend any action regarding an adopted plan").

and protections attendant to that relationship. There is no textual support, however, for the proposition that the Constitution itself protects communications or other materials exchanged with a lawyer. Rather, the privilege and protection are governed by the common law, which remains in effect unless "repugnant" to the Constitution. Const 1963, art 3, § 7.

Consequently, any privilege and protection accorded to the Commission comes from the common law. Plaintiffs do not dispute the existence of some privilege and protection for public bodies such as the Commission. And our Court of Appeals has accorded government officials and bodies this privilege and protection. See *McCartney v Attorney General*, 231 Mich App 722, 725; 587 NW2d 824 (1998) (holding that memoranda from the Attorney General to the Governor were exempt from statutory disclosure requirements pursuant to the attorney-client privilege); *Booth Newspapers, Inc v Wyoming City Council*, 168 Mich App 459; 425 NW2d 695 (1988) (analyzing the attorney-client privilege of a city council); *Gilmore*, 222 Mich App at 453 (concluding "that the work-product privilege applies in the context of criminal proceedings to the work product of the prosecutor").

The attorney-client privilege "is the oldest of the privileges for confidential communications" and " 'is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.' " *Upjohn Co v United States*, 449 US 383, 389; 101 S Ct 677; 66 L Ed 2d 584 (1981), quoting *Hunt v Blackburn*, 128 US 464, 470; 9 S Ct 125; 32 L Ed 488 (1888). The work-product doctrine similarly reflects the necessity recognized historically that attorneys must "work with a certain degree of privacy, free from

7

unnecessary intrusion by opposing parties and their counsel." *Hickman v Taylor*, 329 US

495, 510-511; 67 S Ct 385; 91 L Ed 451 (1947).[4]

---

[4] It is noteworthy, however, that neither the parties in this case, the dissent, nor our own independent research has discovered any opinion from this Court applying the privilege or protection to governmental bodies. Moreover, while the privilege and the protection are commonly accorded to public bodies, there is scant caselaw analyzing the issue in depth, and some courts and commentators have suggested that the scope of the privilege and the protection are narrower when applied to public bodies. See *Falcone v Internal Revenue Serv*, 479 F Supp 985, 989-990 (ED Mich, 1979) (noting that the privilege extended in this context "is not in every case consistent with the privilege as applied between private parties," that "a broad attorney-client privilege would permit legal opinions, recognized as authoritative interpretations within the agency, to be hidden from the public," and that "the purpose of the privilege is not to protect communications which are statements of policy and interpretations adopted by the agency"); *Nelson v City of Billings*, 390 Mont 290, 305; 2018 MT 36; 412 P3d 1058 (2018) ("It is plain, then, that in a court's review of a claimed privilege when a citizen seeks government information, it should not treat the privileges as sacrosanct. Particularly in light of the presumption of openness the Constitution endows, a reviewing court must examine whether the claimed privilege in a given document is sufficient to keep that document from public disclosure. The attorney-client privilege raises special concerns when the client is a government entity. Though the attorney-client and work-product privileges apply equally to government entities as well as private entities, we must recognize the peculiar nature of government entities vis-à-vis the privileges and the public's right to know. As a threshold matter, the attorney-client and work-product privileges belong to, and benefit, their public sector clients, not the lawyers. Unlike their private adversaries, state and local government entities exist for the sole purpose of serving the public.") (citations omitted); Salkin, *Beware: What You Say to Your [Government] Lawyer May Be Held Against You—The Erosion of Government Attorney-Client Confidentiality*, 35 Urb Law 283, 287-289 (2003) ("Although most courts agree that there is a government attorney-client privilege there is no clear precedent for courts to use in determining its scope. Unlike the private-attorney-client privilege, there is no legal tradition of a government privilege. . . . The most persuasive argument against extending the privilege to government lawyers-clients is that in the public practice of law, the ultimate client might be the general public and not the public official.") (citations omitted); Leslie, *Government Officials As Attorneys and Clients: Why Privilege the Privileged?*, 77 Ind L J 469 (2002) (noting that the application of the privilege to government clients and government attorneys has little historical grounding and arguing that the justification for any privilege is to create an even playing field during litigation).

8

The present question requires consideration of whether Const 1963, art 4, § 6 has limited the attorney-client privilege and the work-product doctrine. Because the privilege and the protection are creatures of the common law, they must give way to the Constitution to the extent they are "repugnant" to it. Const 1963, art 3, § 7. At the time this constitutional provision was ratified, "repugnant" meant "incompatible" or "inconsistent." *Webster's New Collegiate Dictionary* (1973). Thus, to the extent that the common law would shield something the Constitution requires to be disclosed, there is a repugnance and the Constitution must prevail.[5]

---

This is because public bodies work on behalf of the public rather than private interests, and a broad application of the privilege would impede the flow of information to the public, on whose behalf the work is being undertaken. This concern would be especially acute with regard to the Commission, which is unelected and unaccountable to the public through the democratic process. As one author has noted:

> In theory, by taking line-drawing power away from legislators, independent redistricting commissions, almost by definition, prevent the smoke-filled-room approach to redistricting. That said, a common critique of independent commissions is that they take power from accountable members of state legislatures only to put it in the hands of unelected and unaccountable commission members. To combat this concern, independent commissions employ a variety of mechanisms to enable public oversight and participation. [Green, *Redistricting Transparency*, 59 Wm & Mary L Rev 1787, 1806 (2018) (citations omitted).]

Although there appears to be no direct caselaw addressing the scope of the common-law privilege in this context—and the dissent has not pointed us to any—similar concerns have led the Florida Supreme Court to deny that state's legislature the full scope of the legislative privilege (against disclosure of documents) with regard to materials related to the legislature's compliance with constitutional redistricting criteria. See *League of Women Voters of Florida v Florida House of Representatives*, 132 So 3d 135, 148-154 (Fla, 2013).

[5] The dissent merely assumes the truth of its preferred conclusion with its self-serving and legally unsupported assertion that the term "legal representation" incorporates the ratifiers' understanding of all the legal principles attendant to that representation. However, contrary

9

## B. OPEN MEETINGS

As noted, plaintiffs request two basic categories of materials: (1) the recording from the secret meeting that occurred on October 27, 2021, and (2) the 10 memoranda, including the two discussed at the October 27 meeting. With regard to the first category, the plaintiffs' basis for the request is Const 1963, art 4, § 6(10):

> Each commissioner shall perform his or her duties in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process. *The commission shall conduct all of its business at open meetings.* Nine commissioners, including at least one commissioner from each selection pool shall constitute a quorum, and all meetings shall require a quorum. The commission shall provide advance public notice of its meetings and hearings. The commission shall conduct its hearings in a manner that invites wide public participation throughout the state. The commission shall use technology to provide contemporaneous public observation and meaningful public participation in the redistricting process during all meetings and hearings. [Emphasis added.]

Because this involves the actions of a public body, "business" was used as a term of art with a specialized meaning. MCL 8.3a. In the parliamentary setting applicable to public bodies, *Black's Law Dictionary* (11th ed) defines "business" as "[t]he matters that come before a deliberative assembly for its consideration and action, or for its information with a view to possible action in the future."[6]

---

to the dissent, it is not up to this Court "to harmonize the Commission's constitutional obligation to conduct its business in public with its constitutional right to legal representation." The Constitution sets the balance. The Commission is entitled to retain lawyers and seek legal advice. But when it comes to legal advice relating to the development and eventual adoption of redistricting plans, the legal advice provided to the Commission must be open to the public.

[6] The relevant lay meaning of "business" is not much different: "work that is part of a job." Merriam-Webster.com Dictionary, *Business* <https://www.merriam-webster.com/dictionary/business> (accessed December 17, 2021) [https://perma.cc/U32K-3NWV]. The Commission has proposed a definition that means "decisional actions." But

10

The Commission's core "business" is the development and adoption of redistricting plans. Const 1963, art 4, §§ 6(1), 6(9). The question we are presented with here is whether obtaining legal advice with respect to the validity of the plans is part of the Commission's "business," i.e., the development and adoption of the plans. As a general matter, it seems obvious that such advice is part of the Commission's "business." After all, the Commission is not charged with drawing illegal maps, but it necessarily must draw legal ones. See Const 1963, art 4, § 6(13)(a) (requiring the districts drawn to "be of equal population as mandated by the United States constitution" and "comply with the voting rights act and other federal laws"). And this is important, because the maps are essentially legal products—their content and construction is determined by law. The Commission's own argument in this Court shows this to be true. It notes that the two memoranda discussed at the October 27 meeting were to ensure that the maps complied with the Voting Rights Act, 52 USC 10101 *et seq.*, which imposes various requirements that must be considered when constructing the maps. See, e.g., *League of United Latin American Citizens v Perry*, 548 US 399, 436; 126 S Ct 2594; 165 L Ed 2d 609 (2006) (noting that the Voting Rights Act

_____

it has failed to offer any supporting authority, such as cases or dictionaries, to support its interpretation of the constitutional text. The Commission merely suggests that its interpretation is consistent with the Open Meetings Act (OMA), MCL 15.261 *et seq.*, but the OMA expressly provides that "[a]ll decisions of a public body must be made at a meeting open to the public." MCL 15.263(2). Thus, any focus on decisions in that context stems from the particular text of the statute. In the present context, by contrast, incorporating such a limitation without the rest of the OMA's framework would threaten to eviscerate the higher level of protection afforded by the Constitution's open-meetings requirement. If the only meetings that needed to be conducted in the open were those at which decisions are made, then the Commission could operate mostly in secret, popping out into the open only to cast a "decisional" vote on matters discussed and deliberated upon in private.

requires considerations such as the proportionality of minority-majority group districts to the group's share of the population and the history of voting-related discrimination in the state or subdivision). As noted above, our Constitution specifically *requires* the Commission to consider the Voting Rights Act when "proposing and adopting each plan," and it places this consideration as the Commission's top priority. Const 1963, art 4, § 13(a). And in any event, because knowledge of the Voting Rights Act is important to comply with the law and avoid subsequent litigation, by definition the act must be considered when drawing the districts. That is no doubt why the Commission wanted this information *before* it adopted any maps.

Legal advice on how to draw a map is therefore akin to statistical advice on demographics or other expert counsel. The Constitution suggests such a view. Section 6(5) is useful:

> Beginning no later than December 1 of the year preceding the federal decennial census, and continuing each year in which the commission operates, the legislature shall appropriate funds sufficient to compensate the commissioners and to enable the commission to carry out its functions, operations and activities, which activities include retaining independent, *nonpartisan subject-matter experts and legal counsel*, conducting hearings, publishing notices and maintaining a record of the commission's proceedings, and *any other activity necessary for the commission to conduct its business* . . . . [Emphasis added.]

This provision demonstrates that retention of experts and counsel is an "activity necessary for the commission to conduct its business" because adopting maps that comply with the law is a necessary part of the Commission's business, and obtaining counsel's advice is necessary to that end.

12

From this perspective, the October 27 meeting addressed the "business" of the Commission. As the Commission itself acknowledges, the memoranda considered at the meeting involved how to bring the maps in compliance with federal law. Indeed, according to the Commission, the meeting was "replete with questions a client would ask his or her attorney about how to comply with the law and candid answers and guidance by the Commission's attorneys." This demonstrates that the meeting involved the core business of the Commission. While such advice might otherwise be privileged as a communication from an attorney, any such privilege must yield to the constitutional requirement that the Commission "conduct *all* of its business at open meetings." Const 1963, art 4, § 6(10) (emphasis added).

The Commission suggests that the meeting was conducted in relation to litigation that would almost certainly ensue. To be sure, "you don't need a weatherman to know which way the wind blows" with redistricting—litigation is likely inevitable. Bob Dylan, *Subterranean Homesick Blues*, on Bringing it All Back Home (Columbia Records 1965). But as noted, the plans themselves are a legal product, comprising numerous legal determinations about what the law requires when drawing the maps. No doubt, these decisions are made so that the Commission can produce maps that successfully withstand legal challenges. But that is a function of the Commission's duty to develop and adopt redistricting maps. Thus, mere anticipation of litigation is not enough at this stage of the process to overcome the constitutional mandate that business be conducted in the open. Indeed, allowing the simple prospect of litigation to shield the Commission's discussions on how to make a map would threaten to swallow the open-meeting requirement

13

altogether.[7]   On the other hand, concluding that "business" encompasses all ongoing litigation would result in a radically uneven playing field in court.  The litigants on the other side of the case would enjoy the ability to have confidential communications with their attorneys concerning the litigation, while the Commission would be forced to conduct its planning and strategizing in public.[8]

---

[7] Cf. *People v Whitney*, 228 Mich App 230, 246-247; 578 NW2d 329 (1998) ("It would be illogical to construe the attorney-client-privilege exemption [to the OMA] as authorizing a public body to evade the open meeting requirements of the OMA merely by involving a written opinion from an attorney in the substantive discussion of a matter of public policy for which no other exemption in the OMA would allow a closed meeting."); 35 ALR5th 113, 124, § 2(a) (discussing open-meeting statutes and noting that "some of these courts have observed that since much of the business of public boards involves decisions which someone will take offense at and might start a lawsuit, conceivably almost all public business could be considered to be related to litigation in some way, and thus the exception would swallow the rule, and thus they have construed the exception much more narrowly").

   A different calculus may occur after litigation has commenced.  If the subject matter of the litigation involves the business of the Commission—because it concerns the Commission's ongoing efforts to develop and adopt the maps—then the text of the Constitution must prevail and the "business" must be conducted in open meetings.  But by definition, if the litigation involves matters other than those falling within the Commission's "business," then that litigation would not come within the constitutional requirement in Const 1963, art 4, § 6(10).

[8] As noted above, courts and commentators who have questioned whether public bodies such as the Commission deserve the full scope of the privileges and protections given to private litigants nonetheless recognize the need for fair rules applicable to both sides once a case commences.  See *State ex rel Leslie v Ohio House Fin Agency*, 105 Ohio St 3d 261, 267; 2005-Ohio-1508; 824 NE2d 990 (2005) (" '[C]ourts generally have construed open-meeting, open-files, whistle-blower, and similar statutes as subject to the attorney-client privilege, recognizing that otherwise governments would be at unfair disadvantage in litigation, in handling claims and in negotiations.' ") (citation omitted); *Government Officials*, 77 Ind L J at 528 ("[A] government attorney should have the same ability to develop her case as her private adversary.").

Because the October 27 meeting in this case concerned the development and adoption of the plans and not any pending litigation, the subject of the meeting constituted the Commission's "business" and therefore had to be conducted in an open session under Const 1963, art 4, § 6(10). We therefore conclude that the recording of the meeting held in violation of the Constitution must be disclosed.

## C. SUPPORTING MATERIALS

Plaintiffs' second request is for 10 memoranda, including the two discussed at the October 27 closed session and eight others. The basis for the request is Const 1963, art 4, § 6(9):

> *After developing at least one proposed redistricting plan for each type of district, the commission shall publish the proposed redistricting plans and any data and supporting materials used to develop the plans.* Each commissioner may only propose one redistricting plan for each type of district. The commission shall hold at least five public hearings throughout the state for the purpose of soliciting comment from the public about the proposed plans. Each of the proposed plans shall include such census data as is necessary to accurately describe the plan and verify the population of each district, and a map and legal description that include the political subdivisions, such as counties, cities, and townships; man-made features, such as streets, roads, highways, and railroads; and natural features, such as waterways, which form the boundaries of the districts. [Emphasis added.]

Plaintiffs contend that the memoranda constitute "supporting materials used to develop the plans" that were proposed on October 11, 2021, and later revised and published in November. In response, the Commission contends that the memoranda all involve privileged communications with its attorneys in which the Commission sought legal advice. Because they involve legal advice, they cannot constitute "supporting materials," according to the Commission. This is so because the term "supporting materials" must be

15

understood in the context of the associated term "data." Since "[a]ssociated words bear on one another's meaning," Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 195, the Commission argues that "supporting materials" must be limited to purely factual information and not legal opinions from its attorneys.

We find no such limitation on the meaning of the term. The associated-words canon holds that when words are "associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar. The canon especially holds that 'words grouped in a list should be given related meanings.' " *Id*. (citation omitted). The "terms must be conjoined in such a way as to indicate that they have some quality in common." *Id*. at 196. But here, the common quality of the terms "data" and "supporting materials" is that they are things used in the development of the maps—not that they were limited to factual information as opposed to advice or opinion. Indeed, it would be odd if opinions were excluded since the commissioners are each invited by Const 1963, art 4, § 6(9) to propose their own maps. It is not clear why the commissioners' differences of opinion must be based on factual materials rather than advice or opinions. Thus, we agree with the Attorney General that the publication requirement in § 6(9) "is broad" and "does not appear to contain any limitation on publication of the materials used to develop the plan . . . ." OAG, 2021, No. 7,317, p ___.

The Commission further contends that since some of the memoranda are dated after the first proposed plans were published on October 11, 2021, they could not support the development of those earlier plans. In other words, it is chronologically impossible to say

16

that these memoranda were "used to develop" plans that came into existence before the memoranda. The problem with this argument, however, is that nothing in the text of the Constitution suggests that the Commission is prohibited from revising the plans after they are first published. The Constitution itself certainly suggests that the Commission is not limited to the proposed maps. For example, it requires that the Commission comply with the federal laws not only when proposing the maps but when adopting them too; if the proposals fail to comply with the law, no doubt the Commission not only *could* revise them, but *must*. The Commission certainly does not argue that its authority is so limited and, as a practical matter, the Commission appears to have made revisions after the October 27, 2021 meeting. See, e.g., Independent Citizens Redistricting Commission, November 3, 2021 Meeting <https://www.youtube.com/watch?v=us4cEhQjmzA> at 2:00:00 and 2:24:50 (accessed December 17, 2021). It would make little sense for the Commission to be prevented from making such changes—what would be the point of having five public hearings after publishing the proposed maps? Because the maps are subject to revision, materials produced after the maps are initially published under Const 1963, art 4, § 6(9) might nonetheless be used in developing the maps.

This conclusion is borne out by a close examination of the text of Const 1963, art 4, § 6(9). The first clause of the first sentence starts out by setting up an obligation that is triggered *after* an event occurs. That event is the development of "at least one proposed redistricting plan for each type of district . . . ." The use of "at least one" indicates there can be more than one. And indeed, each commissioner can develop his or her own maps. But as soon as one set is developed, the Commission must "publish the proposed redistricting plans and any data and supporting materials used to develop the plans." The

17

fact that there can be more than one set of plans, but that the obligation is triggered after the development of the first set, necessarily means that the obligation is an ongoing one. That is, when the next proposed plans are developed, they too must be published along with their supporting materials. It would make no sense to say that only the first set of maps needs to be published. This follows, too, from the definition of "develop": "to cause to evolve or unfold gradually : to lead or conduct (something) through a succession of states or changes each of which is preparatory for the next" or "to create or produce especially by deliberate effort over time[.]" Merriam-Webster.com Dictionary, *Develop* <https://www.merriam-webster.com/dictionary/develop> (accessed December 17, 2021) [https://perma.cc/75AR-CJB5].

Because the obligation is ongoing, and because there are no restrictions on revising the plans, it follows that new materials could be considered by the Commission as it decides whether and how to revise the plans. Whether the plans are ultimately revised is irrelevant to whether the subsequent materials were used to develop the plans. Materials that advise against change, or that are simply considered when determining whether to make a change, can be part of a development process, if change is possible. And, as noted, the whole public hearing process seems geared to enable change.[9] Therefore, materials are not excluded

---

[9] The Commission argues that this interpretation of "supporting materials" is overly broad, in that it could reach any commercial, magazine, or video that a commissioner sees that helps inform his or her view of the plan. That is not simply not the case. There is a difference between being influenced by something and using it. To "use" materials is to "do something with [them] in order to accomplish a task" or to "put [them] into action or service[.]" Merriam-Webster.com Dictionary, *Use* <https://www.merriam-webster.com/dictionary/use> (accessed December 17, 2021) [https://perma.cc/XBB4-DZGN]. Thus, when the Commission sits down to develop plans, the materials it "uses"

18

from the publication requirement in Const 1963, art 4, § 6(10) simply because they were created and considered during the revision process.

Nonetheless, to fall within the publication requirement, the materials must "support[]" the development of a plan. To "support" the plan's development means "to hold up or serve as a foundation or prop for" the plans. *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, there must be some connection between the materials and the plan's development. In making the determination of whether there is a sufficient connection, we are guided by the context offered in the analysis of the open-meetings requirement above. Under that analysis, the "business" of the Commission is to develop and adopt redistricting plans. Clearly, any materials related to the plans' substance would be supporting. For example, a memorandum describing the demographics of a region in Michigan, to be used in shaping the contours of a district, would "support" the development of the map. And for the reasons given above, a memorandum containing legal advice about how a district needs to be constructed in order to comply with the law would also be a "supporting material." But the connection between the materials and the plan's development might be too attenuated to justify the conclusion that the materials somehow provided a foundation for, i.e., supported, the plan's development. This will of course depend upon the nature of the materials at issue, but in general, the further the materials

---

are those it actually employs in drafting the plans, not those that have helped shape the life experience or general worldview of the commissioners.

19

stray from the content of the plan or the process by which that content was developed, the less likely it is that they can be said to support the plan's development.[10]

Turning to the requested items, plaintiffs first seek a memorandum from January 21, 2021 entitled "Guidance on Subsection 11 of Art. IV § 6 of the Michigan Constitution— ICRC [i.e., Commission] Communications with the Public." The Commission describes the memorandum as follows: "Attorney-client communication and attorney work product providing interpretation and legal advice with associated risks and penalties outlined regarding constitutional restrictions on individual Commissioner behavior." The question is whether this item provides a foundation for the development of plans. Based on the title and description, it is apparent that the memorandum bears an insufficient relationship to the plans to justify deeming it a supporting material in their development. The memorandum has no direct bearing on the plans or how they were formed. Rather, the memorandum deals with the individual interests and behavior of the commissioners themselves.

---

[10] The dissent suggests that the last sentence of Const 1963, art 4, § 6(9) expressly specifies everything that must be published: "Each of the proposed plans shall include such census data as is necessary to accurately describe the plan and verify the population of each district, and a map and legal description that include the political subdivisions, such as counties, cities, and townships; man-made features, such as streets, roads, highways, and railroads; and natural features, such as waterways, which form the boundaries of the districts." It does nothing of the sort. Instead, the last sentence requires certain information be included with "[e]ach of the proposed *plans*," including census data pertaining to the population of each district and a "map and legal description" demarcating features like the boundaries of governmental units, streets, and waterways. Const 1963, art 4, § 6(9) (emphasis added). This is a clear description of what must be published pertaining to the "plan." But the constitutional provision separately requires that the "supporting materials" be published, and it is that language we interpret and enforce today.

20

The next two memoranda relate to the action brought by the Commission this past summer seeking to obtain our approval to delay various deadlines imposed by the Constitution. See *In re Independent Citizens Redistricting Comm*, ___Mich___; 958 NW2d 855 (2021). The titles and accompanying Commission descriptions are as follows:

- March 2, 2021: "MICRC Litigation Options to Address Delay of Census Data": "Attorney-client communication and attorney work product regarding the potential filing of litigation on behalf of client. Commission adopted Resolution 2021.02.10 to Authorize Legal Action to Address the Impact of the Delay in the Release of 2020 Census Data on March 5, 2021."

- May 25, 2021: "Update on Michigan Supreme Court Petition and Next Steps": "Attorney-client communication and attorney work product regarding pending litigation."

That the two memoranda relate to specific litigation would not prevent their disclosure if they were materials that supported the development of a map. But the action itself did not directly involve either the substance of the maps or the actual mechanics for drawing the maps.[11] Rather, it related to the Commission's response to being deprived of

_____

[11] In a similar vein, it appears to us that a strong argument could be made that materials produced to defend a map in court would not be "supporting materials." By the time a map is challenged in court, it will likely be the case that the Commission will have already voted to adopt the map and thus its formal opportunity to revise the map will have passed. In those cases, the litigation materials will almost certainly not be used to determine the content of the map or the process by which it was drawn.

data that it alleged was necessary for drawing the maps. Consequently, the memoranda do not constitute "supporting materials" and therefore were not required to be published.[12]

We reach a contrary conclusion with regard to the remaining seven memoranda, the dates, titles, and descriptions of which are as follows:

- June 24, 2021: "One Person, One Vote and Acceptable Population Deviations": "Attorney-client communication and attorney work product providing case law interpretation and legal advice analyzing issues of compliance in Michigan and potential future litigation."

- October 7, 2021: "Legal Considerations and Discussion of Justifications re: Criteria": "Attorney-client communication and attorney work product providing case law interpretation and legal advice analyzing issues of compliance in Michigan and potential future litigation."

- October 14, 2021: "Voting Rights Act": "Attorney-client communication and attorney work product providing case law interpretation and legal advice with associated litigation risks related to certain redistricting criteria."

- October 26, 2021: "The History of Discrimination in the State of Michigan and its Influence on Voting": "Attorney-client communication and attorney work product providing case law interpretation and legal advice with associated litigation risk related to certain redistricting criteria. Sets forth research,

_____

[12] Ironically, the three memoranda that we find need not be disclosed—including two that plaintiffs would seem to concede do not need to be disclosed because they related to pending litigation—would, under the dissent's view, still potentially be subject to disclosure after an *in camera* review.

22

interpretation and legal advice regarding threshold issues required to be met by Plaintiffs in Voting Rights Act challenges."

- November 3, 2021: "Memorandum Regarding Renumbering of Electoral Districts": "Attorney-client communication and attorney work product providing interpretation, legal advice and guidance with associated litigation risks."

- November 4, 2021: "Redistricting Criteria": "Attorney-client communication and attorney work product demonstrating attorney mental impressions and legal approach. Sets forth interpretation of relevant case law and provides legal advice analyzing issues of compliance in Michigan and potential future litigation."

- November 7, 2021: "Memorandum Concerning Subsections 9 and 14 of Art. IV, § 6": "Attorney-client communication and attorney work product demonstrating attorney mental impressions and legal approach. Sets forth interpretation of relevant case law and provides legal advice analyzing issues of compliance in Michigan and potential future litigation."

While the descriptions variously refer to "potential future litigation," it is clear that each memorandum concerns the core content of the maps or the immediate process by which that content is developed. We have already demonstrated this with regard to the October 14 and October 26 memoranda, which the Commission discussed at the closed meeting on October 27.

The June 24 memorandum involves the principle of "one person, one vote." This is a central requirement in district mapmaking, referring to the rule that " 'the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must

be apportioned on a population basis.' " *CPMC*, 503 Mich at 85, quoting *Reynolds v Sims*, 377 US 533, 568; 84 S Ct 1362; 12 L Ed 2d 506 (1964). This rule directly affects how maps are drawn. See Const 1963, art 4, § 6(13)(a). Indeed, we instructed the Commission's predecessor (under the original version of the 1963 Constitution) to redraw maps after this rule was announced by the United States Supreme Court in 1964. *CPMC*, 503 Mich at 86.

The October 7 and November 4 memoranda likewise relate directly to the development of the maps. The "criteria" are a list of factors that the "commission shall abide by . . . in proposing and adopting each plan, in order of priority." Const 1963, art 4, § 6(13). These include, for example, the rule noted above that apportionment must be based on population. See Const 1963, art 4, § 6(13)(a). In addition, another factor the Commission must consider when constructing the map is that the "[d]istricts shall be geographically contiguous." Const 1963, art 4, § 6(13)(b). Such criteria go to the core mapmaking process, and therefore the memoranda discussing the criteria constitute supporting materials the Commission relied on to develop its proposed maps.

The final two memoranda also bear a direct connection to the development of the plans. The November 3 memorandum concerns renumbering the electoral districts. The numbering of the districts is constitutive of the maps themselves and thus any memorandum on how to renumber the districts would support the development of the redistricting plans. Finally, the November 7 memorandum concerns the direct process by which the Commission proposes the maps and receives comments on them, which is an important part of the development of the maps. The first constitutional section mentioned in the memorandum title is Const 1963, art 4, § 6(9), which we have discussed in this

opinion and which lays out the process for the initial publication of the proposed maps and supporting materials. Const 1963, art 4, § 6(14) establishes the procedure the Commission must follow to adopt a plan. This includes, relevantly, the requirement that the Commission allow for "at least 45 days for public comment on the proposed plan or plans" before voting to adopt them. Const 1963, art 4, § 6(14)(b). These two constitutional provisions describe the final steps in the development of the map. Memoranda discussing these provisions thus relate to the development of the maps and are consequently "supporting materials."

Accordingly, the Commission is required to publish the following memoranda under Const 1963, art 4, § 6(9): those from June 24, October 7, October 14, October 26, November 3, November 4, and November 7.[13]

### III. CONCLUSION

The voters in 2018 changed the process for redistricting in Michigan. In doing so, they established numerous safeguards to ensure that the new process would be transparent. Today, we enforce two of those provisions against the Commission's attempt to operate

---

[13] The dissent faults us for not conducting an *in camera* review of certain memoranda and the recording of the October 27 closed-session meeting. But an *in camera* review is not necessary in this case. Unlike the dissent—which questions the Commission's assertion that the materials involve attorney-client privilege—we take the Commission at its word regarding its description of the memoranda and meeting, and we find it adequate to resolve the constitutional issues presented today. Any further delay in this emergency case, which we have heard and decided on an expedited basis, would only serve to hinder the public's ability to consider these materials *before* the impending close of the public comment period on December 27, 2021. We have not "[a]ct[ed] in haste"; instead we have worked assiduously to ensure that the public's constitutional right to this information is vindicated in a timely and meaningful manner.

outside of public view.[14]   We hold that the Commission's October 27 closed-session meeting violated the requirement in Const 1963, art 4, § 6(10) that the Commission

[14] The dissent bemoans that the "prior process was shrouded in secrecy."  We believe, by contrast, that the policy views behind the ratification of the amendment are not our concern and have no analytical weight in determining the meaning of the Constitution.  In a similar manner, while the dissent emphasizes the number of meetings and hearings the Commission has held, this is beside the point.  No number of open meetings and hearings can make up for the Commission's concealing that which must be disclosed.  Ultimately, we are not a cheerleader or critic of our prior redistricting process or the current one; we simply endeavor to interpret and apply the common meaning of the constitutional text.

In any event, we are unmoved by the dissent's overheated rhetoric and unfounded prediction that our opinion will cause the heavens to fall.  In this regard, it is worth noting that the drafters of this constitutional provision, Voters Not Politicians, apparently do not agree that the Commission will be kneecapped by disclosure of all the requested materials.  Voters Not Politicians, *Statement on Michigan Supreme Court Oral Arguments*, available at <https://votersnotpoliticians.com/voters-not-politicians-statement-on-michigan-supreme-court-oral-arguments/> (accessed December 20, 2021) [https://perma.cc/P33L-2PAZ] ("Voters established the Commission to bring redistricting out into the open.  Anything that informs the Commission's mapping decisions should be made public.").  More importantly, we are not the first court to note limitations on the scope of the attorney-client privilege and the work-product doctrine.  Indeed, at least one court has limited the scope of the privilege in an analogous context even for subjects in litigation.  See *Tausz v Clarion-Goldfield Community Sch Dist*, 569 NW2d 125, 128 (Iowa, 1997) (noting multiple cases in which the courts discussed the limits of the privilege in this context given that the government "client" represents the public, and that the highest court of one state has suggested that the privilege "ordinarily should not be extended to communications requesting legal advice concerning the agency's statutory duties even when that issue has been made the subject of litigation"); 1 Attorney-Client Privilege in the United States (December 2021 update), § 4:28, p ___ (noting one federal court that limited the government's privilege to materials that "were undertaken by the government while acting in a capacity similar to a 'private party seeking advice to protect personal interests' ") (citation omitted).  Regardless, our holding today rests squarely upon the constitutional text.

For that reason, too, the dissent's invocation of out-of-state caselaw falls flat.  The dissent's survey of how other states have addressed privilege when it comes to redistricting commissions fails to reflect that our Constitution is unique and our obligation is to protect and defend the Michigan Constitution, not to render opinions that conform to the law of

"conduct all of its business at open meetings." The discussion that occurred at that meeting involved the content and development of the maps and thus constituted the "business" of the Commission. We further hold that the Commission was required by Const 1963, art 4, § 6(9) to publish the seven most recent memoranda sought by plaintiffs. Those seven memoranda constitute "supporting materials used to develop the plans" because they concern the content of the maps and the direct process by which the maps were developed. We agree with the Commission, however, that the remaining three memoranda are not "supporting materials." To remedy these violations of the Constitution, we order production of the recording of the October 27 meeting and the seven memoranda noted above. All documents and other materials must immediately be turned over to plaintiffs and made public. Pursuant to MCR 7.315(C)(3), the Clerk of the Court is directed to issue the judgment forthwith, and the filing of a motion for rehearing shall not stay execution or enforcement of the judgment.

David F. Viviano
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement

---

other states. The only similar text the dissent points to is from Arizona's constitution, Ariz Const, art 4, part 2, § 1(12). Arizona courts, however, have held that the state's open-meetings law applies to its independent redistricting commission. See *State ex rel Montgomery v Mathis*, 231 Ariz 103, 107; 290 P3d 1226 (2012). That is not an argument pressed here, presumably because our Constitution has severely restricted, if not eliminated altogether, the Legislature's power over the Commission. See, e.g., Const 1963, art 4, § 6(22) ("[T]he powers granted to the commission are legislative functions not subject to the control or approval of the legislature, and are exclusively reserved to the commission."). And, lastly, it is also worth noting that our Legislature has recently voted, with near unanimity, to prevent any application of the OMA to the Commission that would allow closed-session meetings. See 2021 SB 728.

STATE OF MICHIGAN

SUPREME COURT

THE DETROIT NEWS, INC., DETROIT
FREE PRESS, INC., THE CENTER FOR
MICHIGAN, INC., also known as BRIDGE
MICHIGAN, MICHIGAN PRESS
ASSOCIATION, and LISA McGRAW,

        Plaintiffs,

v                              No. 163823

INDEPENDENT CITIZENS
REDISTRICTING COMMISSION,

        Defendant.

_____

CLEMENT, J. (*concurring in part and dissenting in part*).

I join the Court's opinion and, most relevantly, its interpretation of what qualifies as the "business" of the Independent Citizens Redistricting Commission (the Commission) and what qualifies as "supporting material" to proposed maps. As a result, I concur with both the Court's holding that the January 21, March 2, and May 25, 2021 memoranda do not qualify as "supporting material" and its holding that the June 24, October 7, October 14, October 26, November 3, November 4, and November 7, 2021 memoranda *do* qualify as supporting material, for the reasons stated. That said, notwithstanding my agreement that the January 21, March 2, and May 25 memoranda are not "supporting material," I would order their disclosure because concealing them is, in my judgment, incompatible with the Commission's obligation to conduct business at open meetings.

As the Court notes, the Commission was established in 2018 to take the power to draw legislative districts out of the hands of the Legislature and put it in the hands of an independent body. It is composed of commissioners who are randomly selected for the task, Const 1963, art 4, § 6(2)(d)(*ii*) and (f), meaning that commissioners are neither elected to their role nor answerable to an elected official, nor even selected by an elected official. Indeed, commissioners are apparently even more insulated from oversight than federal judges, who enjoy life tenure but are subject to impeachment by Congress; by contrast, "[t]he commission, and all of its responsibilities, operations, functions, contractors, consultants and employees are not subject to change, transfer, reorganization, or reassignment, and shall not be altered or abrogated in any manner whatsoever, by the legislature." Const 1963, art 4, § 6(22). With this radical insulation from accountability comes requirements for radical transparency. One of those is the obligation that "[t]he commission shall conduct all of its business at open meetings." Const 1963, art 4, § 6(10). The question then becomes what the Constitution means by "open meetings." On its face, this at least requires that the Commission cannot deny physical access to its meetings when it is conducting "business." However, I believe there are clues in the constitutional text that indicate this is an obligation for more than mere access. I believe it obliges the Commission to produce all 10 of the memoranda at issue, and it is thus both an independent rationale for ordering the Commission to produce the seven memoranda the Court obliges it to produce today as well as a reason to compel it to produce the remaining three.

First of all, I believe that Subsections (10) and (11) should be read together. The requirement in Subsection (10) that "[t]he commission shall conduct all of its business at open meetings" should be understood in the context of the requirement in Subsection (11)

2

that "[t]he commission, its members, staff, attorneys, and consultants shall not discuss redistricting matters with members of the public outside of an open meeting of the commission . . . ." I construe these as constituting a dyad of sorts that is intended to extend to all redistricting communication—Subsection (10) contemplates that communication internal to the Commission only occur at open meetings, and Subsection (11) prohibits communication with the public *except* at an open meeting, producing an outcome that all communication about redistricting must occur at open meetings. While Subsection (11) contains an exception that "a commissioner may communicate about redistricting matters with members of the public to gain information relevant to the performance of his or her duties if such communication occurs (a) in writing or (b) at a previously publicly noticed forum or town hall open to the general public," the opportunity to gain such information if it is "in writing" clearly suggests that the "writing" must be publicly available. It would be nonsensical to say that a nonpublic communication that would otherwise be prohibited is allowed if it is reduced to writing—clearly it is intended that the written document be available to the public. I am unwilling to infer, in the midst of all of this explicit commitment to doing business in the open, that the attorney-client privilege implicitly derogates from that openness.

Second, the "open meetings" requirement in the constitutional language is in notable contrast with, and broader than, other constitutional open-government requirements. As to the Legislature, the Constitution requires that "[t]he doors of each house shall be open unless the public security otherwise requires." Const 1963, art 4, § 20. This language clearly extends *no further* than physical access to the chamber. Regarding public universities, the Constitution requires that "[f]ormal sessions of governing boards of such

3

institutions shall be open to the public." Const 1963, art 8, § 4. "That the provision is limited to 'formal sessions,' rather than all sessions, signifies that the governing boards retain their power to decide whether to hold 'informal' sessions in public." *Federated Publications, Inc v Mich State Univ Bd of Trustees*, 460 Mich 75, 91; 594 NW2d 491 (1999). Here, by contrast, the constitutional language flatly requires that the Commission "conduct all of its business at open meetings," which both communicates a broader requirement than merely the physical access required of the Legislature and denies the possibility for "informal" sessions given to university boards. The exclusion of these maneuvers from the constitutional language communicates to me an intent that *all* of the Commission's business must be conducted in the open—to the exclusion of similar maneuvers that would conceal aspects of the Commission's business.

In light of these observations about the constitutional text, I would construe the requirement of open meetings as defeating any claim of attorney-client privilege the Commission asserts as to documents that relate to the Commission's business. As the Court of Appeals has held with respect to the Open Meetings Act (OMA), MCL 15.261 *et seq.*, "[i]t would be illogical to construe the attorney-client-privilege exemption [to the OMA] as authorizing a public body to evade the open meeting requirements of the OMA merely by involving a written opinion from an attorney in the substantive discussion of a matter of public policy for which no other exemption in the OMA would allow a closed meeting." *People v Whitney*, 228 Mich App 230, 247; 578 NW2d 329 (1998).[1] *Whitney*'s

---

[1] I do not mean to suggest that the OMA itself applies here. "[T]he powers granted to the commission are legislative functions not subject to the control or approval of the legislature, and are exclusively reserved to the commission." Const 1963, art 4, § 6(22).

4

reasoning applies with as much or greater force here. While *Whitney* construed a statute, we deal here with constitutional language. " 'A Constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.' " *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 391; 151 NW2d 797 (1967), quoting *May v Topping*, 65 W Va 656, 660; 64 SE 848 (1909) (emphasis omitted). Seeing as the commissioners are obliged to act "in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process," Const 1963, art 4, § 6(10), I believe "the great mass of the people themselves" would reject the possibility that the Commission could "evade the open meeting requirements of [Subsection (10)] merely by involving a written opinion from an attorney in the substantive discussion of a matter of" the Commission's business.[2] *Whitney*, 228 Mich App at 247.

As a result, while I concur with the Court's conclusion that the seven memos we order disclosed qualify as "supporting materials" under Subsection (9), I also believe there is an independent obligation to disclose them as part of the open-meetings requirement in

---

This is in notable contrast to the original constitutional language, which required the former eight-member commission to "hold public hearings *as may be provided by law*." Const 1963, art 4, § 6 (as ratified) (emphasis added).

[2] Such a conclusion is compatible with the Commission's prerogative to retain legal counsel under Subsection (5). By giving the Commission this authority, the constitutional language ensures the Commission's *independence*. In its absence, there could be at least some debate about whether the Commission was obliged to be represented by someone not of its choosing (such as the Attorney General) who, not having been chosen by the Commission, could conceivably be hostile to its work. But the Commission need not sacrifice its *openness* to remain *independent*—indeed, that is the essence of its design.

5

Subsection (10).[3]  And while I agree with the Court that the January 21 memorandum does not qualify as "supporting material" under Subsection (9), I do believe it relates to the Commission's "business" under Subsection (10), and I would therefore direct it to be disclosed as part of the Commission's obligation to act in the open.  Finally, while I agree with the Court that the March 2 and May 25 memoranda—relating to the Commission's response to delays in the release of federal census data—do not qualify as "supporting material" under Subsection (9), I believe they ultimately relate to the Commission's "business" and should be disclosed under its obligation to do its business at open meetings under Subsection (10).[4]  I agree with the Court that a "[c]onclu[sion] that 'business' encompasses all ongoing litigation would result in a radically uneven playing field in court," but I do not believe these memoranda were produced in response to "litigation." The only court proceeding was a petition the Commission filed on its own initiative, effectively against itself (if it could even be construed as against anyone), seeking instruction from this Court on whether it could deviate from the deadlines contained in Subsections (7) and (14)(b).  If this could justify the nondisclosure of materials, it could

---

[3] Although the distinction is moot here, since we are well past the point when plans were published, I would note that this would also eliminate the curious outcome that observations from the Commission's legal counsel about map construction in general could wait until the Commission has, as the majority states, " 'develop[ed] at least one proposed redistricting plan for each type of district' " to be published under Subsection (9), and would instead necessitate their availability as soon as such remarks are offered as part of the openness obligation.

[4] To be clear, because the majority does not join my interpretation of what the Commission must do to comply with its obligation to do "business" at "open meetings," it does not reach the question of whether these memoranda qualify as related to the Commission's "business," but instead confines its holding to a ruling that they are not "supporting material" under Subsection (9).  And I agree that they are not "supporting material."

incentivize the Commission to file petitions in this Court for instruction as to other duties it faces and then argue that any resulting memoranda are privileged. It would be rather curious, in my view, if the same memoranda we order disclosed today could have been shielded if the Commission had filed a similar petition seeking instruction on how to satisfy, for example, Subsection (13)(a).

For these reasons, I concur with the Court's order to the Commission directing it to disclose the recording of the October 27 meeting, as well as its directive to disclose the seven memoranda it orders disclosed. However, I would also order the disclosure of the remaining three memoranda identified by plaintiffs in their complaint.

Elizabeth T. Clement

7

S T A T E   O F   M I C H I G A N

SUPREME COURT

THE DETROIT NEWS, INC., DETROIT
FREE PRESS, INC., THE CENTER FOR
MICHIGAN, INC., also known as BRIDGE
MICHIGAN, MICHIGAN PRESS
ASSOCIATION, and LISA McGRAW,

      Plaintiffs,

v

No. 163823

INDEPENDENT CITIZENS
REDISTRICTING COMMISSION,

      Defendant.

WELCH, J. (*dissenting*).

In 2018, Michigan's voters demanded transparency in our redistricting process when they voted to create the Independent Citizens Redistricting Commission (the Commission). On that, the majority and I agree. The prior process was shrouded in secrecy. But today a majority of this Court strips the Commission of a fundamental commitment of our legal system—the attorney-client privilege. They do this despite the voters' having adopted a constitutional amendment that specifically provided "legal representation" to the Commission. The majority also strips the Commission of more than plaintiffs have asked for or think appropriate; plaintiffs believe the Commission retains the

right to a confidential relationship with its lawyers whenever the Commission is involved in litigation or when litigation is imminent.[1]

Acting in haste and without reviewing the disputed communications, the majority has denied the Commission the right to counsel that the voters wanted it to have in order to succeed. Its rule conflicts with both our Constitution and our common law. It is *one of a kind*: there is no precedent for a court wholesale denying confidentiality in an attorney-client relationship. Every other government entity, every legal entity, every person, and indeed every other similar independent redistricting commission in the nation has attorney-client privilege. But as a result of the majority's newly created rule, Michigan's Commission will not.

The majority's rule places into question the Commission's independence and its ability to succeed in its mission of drawing fair, nonpartisan, and legally compliant maps. It deprives the Commission of the ability to best prepare to defend its maps and creates an uneven playing field by giving a litigation advantage to opponents of the Commission's work. As the majority says, the Commission will face multiple lawsuits challenging its maps within weeks of this decision; but it will be unable to confidentially communicate with its lawyers to prepare for that litigation. Nor is it clear from the majority's decision

---

[1] At oral argument, plaintiffs' counsel conceded that its position was not "that the Commission can never have privileged communications with its lawyers." Rather, according to plaintiffs' counsel, "invocation of the attorney-client privilege or work-product doctrine would be consistent with the openness required by the redistricting amendment" in the context of existing or imminent litigation.

whether the Commission can communicate confidentially with its lawyers even when defending a lawsuit.

Because I do not believe that the people of Michigan intended this result, because it is not the result the plaintiffs have asked for, and because the text of Const 1963, art 4, § 6 does not support the majority's conclusion, I dissent.

## I. FACTUAL BACKGROUND

In this original action brought under Const 1963, art 4, § 6(19), plaintiffs, who are various Michigan news organizations and a member of the press, seek a declaratory judgment that the Commission violated Const 1963, art 4, § 6(9) by not disclosing 10 documents containing legal advice created by the Commission's legal counsel and shared with the Commission. Plaintiffs ask us to compel the Commission to publicly disclose those withheld materials. Plaintiffs also seek a declaratory judgment that the Commission violated Const 1963, art 4, § 6(10) by entering into one closed session in order to discuss specific legal advice received from its counsel. They ask us to compel the Commission to release an audio recording of that single closed session and to prospectively order that the Commission may not hold such closed sessions in the future.

The parties agree on the facts. In 2017, Voters Not Politicians, a ballot proposal committee, filed an initiative petition to amend the Michigan Constitution. Identified as Proposal 18-2 on the November 6, 2018 general election ballot, the proposal passed overwhelmingly. The amendment established a commission—the Independent Citizens Redistricting Commission—charged with redrawing Michigan's state senate, state house, and congressional districts according to specific criteria. The amendment requires the

3

Secretary of State to convene the Commission by October 15, 2020, which she did. The first meeting took place on September 17, 2020.

On October 27, 2021, the Commission began a meeting in open session. After adopting an agenda and hearing public comments, the Commission voted to go into closed session (the first in its existence) to discuss two legal memoranda prepared by its retained counsel. The Commission understood that this meeting and the memoranda's content would be confidential under the attorney-client-communication and work-product privileges. According to the Commission, the memoranda focused on issues that were specific to the Commission's work relating to compliance with the Voting Rights Act, 52 USC 10101 *et seq*., with an eye toward inevitable litigation. The Commission admits that "the related privileged closed meeting is replete with questions a client would ask their attorney about how to comply with the law and candid answers and guidance by the Commission's attorneys."[2]

Following that closed session, the individual plaintiffs asked the Commission's communications director for copies of the two memoranda. The Commission denied that request, citing the attorney-client privilege and the work-product doctrine. This lawsuit followed.

---

[2] We know little more than this because we have not ordered the Commission to turn over any of the contested legal memoranda or the recording of the closed-session meeting to the Court for any kind of *in camera* inspection or review.

## II. DISCUSSION

The majority's decision is a Trojan horse. The interest in transparency is one I share, but the majority ignores both the text and intent of the voter-initiated constitutional amendment that created the Commission. I fear it will greatly hamper the Commission's work as it finalizes the current proposed maps for adoption this year and in the years to come.

This is unfortunate. The antidote to partisan gerrymandering historically contrived in backroom deals and without a hint of transparency, the Commission has been the picture of transparency. The Commission has held hundreds of hours of public meetings across the state, during which it has carefully worked to fulfill its constitutional mandate to publicly develop and eventually adopt redistricting plans for Michigan's state senate, state house, and congressional districts.[3] Since mid-August 2021, the Commission—fully in public and in live and virtual meetings across the entire state—has developed many proposed plans for each type of district. The Commission has done so despite "the difficult and unenviable position of undertaking its inaugural redistricting cycle without the full benefit of tabulated decennial census data" that was delayed by more than six months as a

---

[3] According to the Commission, it has held 105 public meetings, 10 public committee meetings, 21 public hearings, and more than 220 informal presentations, town-hall forums, and interviews, besides its other public education and outreach efforts and the maintenance of a comprehensive website of materials and information about the Commission's activities. The Commission's online public comment portal has received 7,265 submissions. More than 10,000 public comments on proposed maps were submitted on the Commission's "My Districting" website. And the Commission has also received thousands of written public comments. The Commission continues to receive public comments, and each comment is available to the public.

result of the COVID-19 pandemic. *In re Independent Citizens Redistricting Comm*, ___ Mich ___, ___; 961 NW2d 211, 212 (2021) (WELCH, J., concurring).

A. CONSTITUTIONAL INTERPRETATION

Our understanding of any voter-initiated constitutional amendment should be the same as the common understanding of those who supported its approval. *Durant v State*, 456 Mich 175, 192; 566 NW2d 272 (1997). Our duty " 'is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express.' " *Id.*, quoting *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).

When we determine the common understanding, we don't do so in the abstract or by reference to some technical rule. *White v Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979). Instead, "[t]he words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the constitution . . . ." *Id.* "This Court cannot properly protect the mandate of the people without examining both the origin and purpose of a constitutional provision, because provisions stripped of their context may be manipulated and distorted into unintended meanings." *Peterman v Dep't of Natural Resources*, 446 Mich 177, 185; 521 NW2d 499 (1994). Finally, "[i]t is also settled beyond dispute that the Constitution is not self-destructive." *In re Apportionment of State Legislature—1964*, 372 Mich 418, 436; 126 NW2d 731 (1964) (quotation marks and citation omitted). "In other words, . . . the powers which it confers on the one hand it does not immediately take away on the other[.]" *Id.* (quotation marks and citation omitted).

6

## B. "LEGAL REPRESENTATION" INCLUDES ATTORNEY-CLIENT AND WORK-PRODUCT PRIVILEGES

The Constitution gives the Commission the right to "legal representation"—to have lawyers act on its behalf. Lawyers defend their clients when they get into legal trouble. And they also counsel their clients to avoid legal trouble. To do both effectively requires the guarantee of confidential communications. Indeed, the attorney-client and work-product privileges are part of the common understanding of what it *means* to be legally represented.[4]

### 1. OUR CONSTITUTION GUARANTEES THE COMMISSION "LEGAL REPRESENTATION"

The Commission availed itself of a tool that our Constitution *unambiguously* affords it. The voters expected that the Commission would encounter circumstances that would require legal help and therefore provided that the Commission could engage "legal representation." Const 1963, art 4, § 6(4). Nothing in the text limited that representation.

This specific authority is distinct from the Commission's separate authority to "hire staff and consultants" and to "retain[] independent, nonpartisan subject-matter

---

[4] The majority misses the point of "common understanding." The majority is correct that "nothing in the text itself makes reference to any attorney-client privilege or protections" and that "[a] reader at the time of ratification would need to infer from the fact that the Constitution allows the Commission to obtain legal representation that the Constitution also incorporates a particular vision of the privileges and protections attendant to that relationship." *Ante* at 6-7. That inference is the only logical one, given that every attorney-client relationship includes confidential communications. That is, the common understanding of legal representation is that the Commissions' lawyers are, well, lawyers. Until today, there was no model of legal representation in which lawyers could not communicate with their clients confidentially.

experts . . . ." Const 1963, art 4, § 6(4) and (5). The voters also provided that the Commission's "functions, operations and activities" include retaining legal counsel and that the Commission has "legal standing to prosecute an action regarding the adequacy of resources provided for the operation of the commission, and to defend any action regarding an adopted plan." Const 1963, art 4, § 6(5) and (6).

"Legal representation" is unambiguous and necessarily includes the attorney-client and work-product privileges.[5] "A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information *relating to the representation.*" MRPC 1.6, ___ Mich ___, ___ (official comment) (emphasis added). Every Michigan lawyer who takes the oath of office to be licensed pledges that they will "maintain the confidence and preserve inviolate the secrets of [their] client . . . ." State Bar of Michigan, *The Lawyer's Oath* <https://www.michbar.org/file/programs/pdfs/lawyersoath.pdf> (accessed December 19, 2021) [https://perma.cc/283W-USET]. The promise of confidentiality is perhaps the most common fact lay people know about lawyers. The right to legal representation includes all its protections because that is necessary to ensure that the legal advice can be honest and the communication not chilled. Put differently, there is no common understanding that legal representation can mean what it has always meant at some moments, and something else at other moments during the attorney-client

---

[5] The majority's below-the-line questioning of government bodies' right to attorney-client privilege is a radical departure from existing law. That governmental entities, including cities, counties, and school districts, are entitled to legal representation that necessarily includes confidentiality is well established in not just Michigan, but the entire nation.

8

relationship. The Constitution guarantees the Commission "legal representation," not legal representation without confidentiality or legal representation-lite.

## 2. THE ATTORNEY-CLIENT AND WORK-PRODUCT PRIVILEGES ARE COMMON-LAW RIGHTS

Both the attorney-client and the work-product privileges are based in our common law. The attorney-client privilege and the confidentiality it guarantees is one of the oldest and most well-recognized privileges. *Upjohn Co v United States*, 449 US 383, 389; 101 S Ct 677; 66 L Ed 2d 584 (1981). The privilege "recognizes that sound legal advice or advocacy serves public ends" and "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him [or her] to give sound and informed advice." *Id*. at 389-390. Until today, "[t]his Court has in prior decisions been inclined for obvious reasons" to give a "liberal interpretation" to the common-law right of attorney-client privilege because "[d]oubtless such interpretation is essential to a proper protection of the rights of the client." *Lindsay v Lipson*, 367 Mich 1, 5; 116 NW2d 60 (1962).

The work-product privilege (sometimes called the work-product doctrine) is also rooted in the common law. See *People v Gilmore*, 222 Mich App 442, 451; 564 NW2d 158 (1997). As the majority concedes, the work-product privilege protects materials prepared by an attorney "in anticipation of litigation." *D'Alessandro Contracting Group, LLC v Wright*, 308 Mich App 71, 84 n 4; 862 NW2d 466 (2014). The United States Supreme Court has explained why:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is

9

essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed . . . as the "work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served. [*Hickman v Taylor*, 329 US 495, 510-511; 67 S Ct 385; 91 L Ed 451 (1947).]

As the majority acknowledges, Article 3, § 7 of our Constitution provides that "[t]he common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." But the majority believes these common-law principles fundamental to the attorney-client relationship are repugnant to the amendment's strong preference for transparency. I disagree; the Commission can both do its work in public and also have the benefit of the "legal representation" the voters wanted it to have.

### 3. THE MAJORITY'S ERRORS

The majority's view that the Commission has a right to legal representation but that legal representation does not mean the same thing for the Commission as it would for any other governmental entity is unsupported by the constitutional language. If the voters

10

meant to deprive the Commission of this fundamental part of legal representation, the constitutional amendment would have said so explicitly.

There is no example in any jurisdiction where the right to legal representation does not include the right to seek and receive legal advice in confidence.[6] That is because confidentiality and sound legal advice are symbiotic. The majority's conclusion that "legal representation" means something less for the Commission undermines a core *and commonly understood* foundation of the legal profession. We have always recognized that the very purpose of the attorney-client privilege, and legal representation generally, is "to promote freedom of consultation for those needing legal advice[.]" *People v Salisbury*, 218 Mich 529, 537; 188 NW 340 (1922) (quotation marks and citation omitted), abrogated on other grounds by *People v Fisher*, 442 Mich 560 (1993).

No constitutional text restricts or repeals the attorney-client and work-product privileges that accompany legal representation under our common law. Instead, the majority holds that the fundamental nature of the attorney-client relationship is "repugnant" to the Commission's separate obligation to conduct its business in public. Without attempting to give meaning to both constitutional requirements, the majority picked one and called the other one abrogated.

This turns our interpretive duty on its head. "In Michigan, the common law prevails except as abrogated by the Constitution, the Legislature, or this Court." *People v*

_____

[6] The Commission may be unique but it is not a unicorn. At oral argument, plaintiffs' counsel conceded that other states with independent redistricting commissions—states that served as models for Michigan's Commission—all afford their respective commissions the attorney-client and other common-law privileges.

11

*Stevenson*, 416 Mich 383, 389; 331 NW2d 143 (1982). Any abrogation cannot be implied, and when there is doubt, the correct meaning is the one "which makes the least rather than the most change in the common law." *Nation v W D E Electric Co*, 454 Mich 489, 494; 563 NW2d 233 (1997) (quotation marks and citation omitted). "Where, as here, there is a claim that two different provisions of the constitution collide, we must seek a construction that harmonizes them both. This is so because, both having been adopted simultaneously, neither can logically trump the other." *Straus v Governor*, 459 Mich 526, 533; 592 NW2d 53 (1999). But the majority makes no attempt to harmonize the Commission's constitutional obligation to conduct its business in public with its constitutional right to legal representation.[7] And these provisions are easily reconcilable.

---

[7] In going into closed session, the Commission followed to the letter a practice accepted by courts and commonly followed by government bodies across this state for more than 40 years that carefully balances the need for transparent public governmental meetings with the common-law right to attorney-client privilege and the recognition that effective legal representation depends on that privilege. See *Booth Newspapers, Inc v Regents of Univ of Mich*, 93 Mich App 100, 106-107; 286 NW2d 55 (1979) ("A public body is privileged to retire to closed session to discuss materials exempt from disclosure" because they are "subject to the attorney-client privilege.") (quotation marks and citation omitted); *Booth Newspapers, Inc v Wyoming City Council*, 168 Mich App 459, 467; 425 NW2d 695 (1988) ("[A] meeting of a public body may be closed for consideration of a written legal opinion within the attorney-client privilege."); *People v Whitney*, 228 Mich App 230, 247; 578 NW2d 329 (1998) ("[P]roper discussion of a written legal opinion at a closed meeting is, with regard to the attorney-client privilege, limited to the meaning of any strictly legal advice presented in the written opinion."); Fisher & Robinson, Michigan Municipal Law (ICLE, ___), § 5.10, p ___ (recognizing that a closed session is available for public bodies to discuss privileged material with "discussions focus[ed] solely on legal matters associated with the attorney-client privileged communications and not tangential issues"). And when there is concern about imbalance, the courts are here to ensure that the privilege is not abused. See, e.g., *Nash Estate v Grand Haven*, 321 Mich App 587, 604; 909 NW2d 862 (2017) (concluding that documents were properly subject to attorney-client privilege

12

Similar language appears in Arizona's constitution, requiring that its "independent redistricting commission shall conduct business in meetings open to the public" and likewise providing no explicit right of attorney-client or work-product privilege. Ariz Const, art 4, part 2, § 1(12). Yet the courts in that state have recognized that Arizona's commission enjoys common-law privileges. See *Arizona Indep Redistricting Comm v Fields*, 206 Ariz 130; 75 P3d 1088 (2003). Until now, no court in a state that has an independent redistricting commission had decided that its commission's right to legal representation encompasses something less than what would be enjoyed by any other public body.

The majority also conflates the need for subject-matter experts with the need for legal representation and ignores the Commission's explanation that the legal memoranda mainly at issue pertained to the threat of legal action against the Commission's maps.[8] Although a lawyer can also provide subject-matter expertise, *only* a lawyer can provide legal representation. Put differently, any lawyer can advise the Commission about any number of relevant issues. But only the Commission's lawyer owes the Commission a duty of loyalty and confidentiality. These are different functions, and both are guaranteed by the constitutional text. We must give meaning to each.

---

following *in camera* review). The Commission retains a record of its closed session, including an audio recording, for this very purpose.

[8] The majority states that "[l]egal advice on how to draw a map is . . . akin to statistical advice on demographics or other expert counsel." *Ante* at 12. This is incorrect. The Commission is afforded *both* subject-matter experts *and* legal counsel. The two are necessarily different. And subject-matter experts do not carry the ethical obligations of legal counsel.

13

## 4. THREAT TO THE COMMISSION'S INDEPENDENCE

The loss of attorney-client and work-product privileges undermines the Commission's independence. The Commission's need for sound legal advice is no different than that of every other governmental board and body in Michigan. The Commission consists of 13 registered voters who, by design, are chosen through a lottery process from the public and are independent of the entrenched political forces that have traditionally held sway with the redistricting process at our state capitol. Const 1963, art 4, § 6(1). The Constitution prohibits declared candidates, elected officials, political-party officers, lobbyists, or family members of such persons from serving as a commissioner. *Id*. Although a commissioner might be a lawyer, and there are lawyers now serving on the Commission, it is not a requirement (and most are not lawyers). The voters chose a process that entrusts redistricting to those outside the existing political system. They anticipated that the Commission would need *both* subject-matter expertise from experts *and* legal representation.

Without the ability to seek legal advice in confidence, there is a significant danger that external influences on the Commission will predominate. Lawyers commonly have different views and understandings of what the law requires. One lawyer may say stop while another says go. Only the Commission's lawyers have an ethical obligation to their client—other lawyers who might appear before the Commission in public comment or through written submission do not. If the Commission's ability to seek or receive legal advice is diminished, the Commission has not received the full benefit of the legal representation guaranteed it by our Constitution.

14

To their credit, plaintiffs do not claim that the Commission does not have a right to a confidential relationship with its lawyers. They acknowledge that the Commission has a privilege with its lawyers in litigation or when litigation is imminent. But the majority goes further than plaintiffs think appropriate, and it does so without reviewing the disputed materials. Courts regularly resolve disputes in which litigants believe that the attorney-client privilege has been improperly asserted. They have tools for doing so and can conduct an *in camera* review of any disputed material. Plaintiffs recognized this solution and specifically requested an *in camera* review of the materials they sought. An *in camera* review would have been a sensible step because this Court must ensure full compliance with the law and that only attorney-client communications—the kind that our society expects will be privileged—are protected from disclosure.[9] Had we conducted such a review, I might have agreed that some of the materials should not be covered by privilege.

But the majority skips that step.

## C. THE MAJORITY'S "STANDARD"

Besides failing to afford the common understanding of "legal representation" guaranteed by Article 4, § 6, the majority invents an amorphous and atextual privilege-lite.

Everyone knows that the best legal strategy is the proactive mitigation of litigation risk in consultation with one's legal counsel. This is just as true for individuals as it is for businesses and public bodies. But apparently not for the Commission.

---

[9] An *in camera* review would not have required any additional time. It could have been conducted in the same time frame as issuing this opinion.

15

The majority recognizes that the Commission must have *some* confidential communications because to hold otherwise results "in a radically uneven playing field in court." *Ante* at 14. But the majority's rule has already stacked the deck against the Commission. Every other would-be litigant would have the benefit of attorney-client and work-product privilege "in anticipation of litigation." *D'Alessandro Contracting Group, LLC*, 308 Mich App at 77.

Even more troubling, the majority does not say to what extent the Commission enjoys these privileges after litigation begins. The majority leaves the Commission and its lawyers with no guidance about how they might communicate once they are sued. This contradicts longstanding precedent. "[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." *Upjohn*, 449 US at 393. The majority's rule places the Commission in an untenable position as it faces certain litigation.

The majority knows that legal challenges are expected with redistricting.[10] The voters anticipated this too: "The terms of the commissioners shall expire once the commission has completed its obligations for a census cycle *but not before any judicial*

---

[10] Redistricting litigation "occurs with clocklike regularity in every redistricting cycle . . . ." Manheim, *Redistricting Litigation and the Delegation of Democratic Design*, 93 B U L Rev 563, 567 (2013). The Detroit News—a plaintiff in this case—published an editorial urging a "no" vote on Proposal 18-2 because it recognized that the proposal was vague and "opens the door to endless litigation." Editorial: *Vote No on All Ballot Proposals*, The Detroit News (October 9, 2018), available at <https://www.detroitnews.com/story/opinion/editorials/2018/10/09/editorial-vote-no-all-ballot-proposals/1565860002/> (accessed December 19, 2021) [https://perma.cc/4CJK-K3YN].

*review of the redistricting plan is complete.*" Const 1963, art 4, § 6(18) (emphasis added). It is hard to imagine that those voting for the Commission would mean to hamstring it from the ability to seek counsel, obtain legal advice, and prepare for litigation and mitigate litigation risk just as every other governmental entity can. And it is impossible to imagine the voters intended to hamstring the Commission's ability to defend against litigation. But the majority has done that.

The majority's rule that the Commission does not have the right to an attorney-client relationship seems to be informed by its unique view that government bodies are not entitled to the same privileges as other attorney-client relationships. This understanding is not shared by our sister courts. The Supreme Court of Iowa "deem[s] it appropriate to recognize an attorney-client privilege with respect to some communications between public agencies or public officials and their lawyers." *Tausz v Clarion-Goldfield Community School Dist*, 569 NW2d 125, 128 (Iowa, 1997) (upholding attorney-client privilege and recognizing "that such determinations must be made on a case-by-case basis" following an *in camera* review as necessary). The Supreme Court of Minnesota has likewise held that attorney-client privilege is necessary "to fully implement the confidentiality of the relationship" and that "[a] basic understanding of the adversary system indicates that certain phases of litigation strategy may be impaired if every discussion is available for the benefit of opposing parties who may have as a purpose a private gain in contravention to the public need as construed by the [governmental body]." *Minneapolis Star & Tribune Co v Minneapolis Housing & Redevelopment Auth*, 246 NW2d 448, 454 (Minn, 1976). The Supreme Court of Ohio rejected a constrained application of the attorney-client privilege for government employees. *State ex rel Leslie*

17

*v Ohio Housing Fin Agency*, 105 Ohio St 3d 261, 270; 2005-Ohio-1508; 824 NE2d 990 (2005) (stating that "the communications by attorney-employees of the state departments in question were subject to the attorney-client privilege and should have been sealed. This furthers the laud[able] objectives of the privilege: complete and candid communication between attorneys and clients."). And the Supreme Court of Tennessee has also recognized that a public body may "provide counsel with facts and information regarding the lawsuit and counsel may advise them about the legal ramifications of those facts and the information given to him" in a closed meeting before moving back to an open meeting for deliberation and decision-making. *Smith Co Ed Ass'n v Anderson*, 676 SW2d 328, 334 (Tenn, 1984). Indeed, it is generally accepted that it is in the public's interest to promote "a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business." *Ross v Memphis*, 423 F3d 596, 602 (CA 6, 2005) (quotation marks and citation omitted) (finding persuasive "the vital role the attorney-client privilege would play in both fostering adherence to law and preventing government entities from being disadvantaged in litigation"). This had always been Michigan's application of attorney-client privilege to governmental entities too, until today.[11]

---

[11] We recognize that the majority's decision might match the current popular mood of how the Commission *should* approach redistricting. But the law is not a popularity contest. Our job is to give meaning to the Constitution and to do so in a way that harmonizes the dual requirements of transparency and a meaningful right to legal representation.

18

III. PLAINTIFFS' COMPLAINT

A. THE VOTING RIGHTS ACT MEMOS

Plaintiffs have focused on the two memos discussed during the closed session: (1) "Voting Rights Act," dated October 14, 2021, and (2) "The History of Discrimination in the State of Michigan and its Influence on Voting," dated October 26, 2021. We have no information about what is in those memos, but the context that surrounded their development matters. On October 11, 2021, as required by § 6(9), the Commission published its proposed plans and held a series of required public hearings to solicit comment from the public about the proposed plans. Following the publication of the proposed plans, some people criticized choices the Commission made to comply with the Voting Rights Act. Some specifically threatened a lawsuit.

At the October 20, 2021 public hearing in Detroit, multiple public commenters identified the prospect of litigation against the Commission, variously stating how the maps "may not pass the Voting Rights Act" and warning how "lawsuits are coming." Michigan Independent Citizens Redistricting Commission (MICRC), *10/20/2021 1:00 pm Public Hearing*, pp 11, 34, available at <https://www.michigan.gov/documents/micrc/ MICRC_Meeting_Transcript_10_20_2021_740711_7.pdf> (accessed December 19, 2021) [https://perma.cc/E44J-8ZTT]. A lawyer and law professor implored the Commission "to take the time to get it right" or "look forward to a robust and vigorous constitutional fight." *Id*. at 105. The executive director of the Michigan Department of Civil Rights also appeared and told the Commission that "the department believes that the maps presented by this Commission violate Federal civil rights law." *Id*. at 65. The Department of Civil Rights later issued a statement repeating its executive director's assertion that there was a

19

need to "rectify the Voting Rights Act violations inherent in the maps under consideration" and submitted its own legal analysis of what the Voting Rights Act required. Michigan Department of Civil Rights, News Release, *MDCR Director John E. Johnson to MICRC: Proposed Electoral Maps "Fail the Test" of Preserving the Voice of Michigan Minorities*, available at <https://www.michigan.gov/mdcr/0,4613,7-138-4952_4995-570914--,00.html> (accessed December 19, 2021) [https://perma.cc/5KCU-DE5X].

It was this public outcry—and the specific threat of litigation—that led to the Commission's decision to confer with its attorneys and review its attorneys' memos in that closed session on October 27, 2021. The Commission wanted its attorneys' advice about whether its proposed plans could withstand legal scrutiny. MICRC, *10/27/2021 1:00 p.m. Meeting*, p 10, available at <https://www.michigan.gov/documents/micrc/ MICRC_Meeting_Transcript_10_27_2021_741050_7.pdf> (accessed December 19, 2021) [https://perma.cc/H7VJ-43AF].[12]

This is precisely the type of communication that lawyers give clients in confidence. The majority's rule will mean that the Commission will not have legal representation to mitigate risk and that its foes can prepare legal challenges privately with their counsel while observing all the legal strategy provided to the Commission. The voters wanted the Commission to succeed; they didn't want a different rigged system.

---

[12] At least one commissioner was persuaded that it was appropriate for the Commission to enter into closed session to discuss privileged legal advice because he recognized it is "a common tool used in redistricting" and "was used significantly in Arizona." MICRC, *10/27/2021 1:00 p.m. Meeting*, p 10. Other commissioners reasonably reflected that there was a fear of the unknown and a need to trust counsel's legal advice. *Id.*

20

I also disagree with the majority's conclusion that Const 1963, art 4, § 6(9), which states that "the commission shall publish the proposed redistricting plans and any data and supporting materials used to develop the plans," requires disclosure of privileged documents.

The interpretative work to understand what "supporting materials" means is simple because the constitutional text is clear. By focusing only on two words, the majority ignores the rest of § 6(9), which explicitly defines what materials the Commission must provide when publishing its proposed plans:

> Each of the proposed plans shall include such census data as is necessary to accurately describe the plan and verify the population of each district, and a map and legal description that include the political subdivisions, such as counties, cities, and townships; man-made features, such as streets, roads, highways, and railroads; and natural features, such as waterways, which form the boundaries of the districts.

The Constitution does not say that the "supporting materials" include privileged materials, and the common-law rule is that they would not. Section 6(14)(b), which sets forth what is required when the Commission is prepared to enter the 45-day comment period before voting to adopt a plan, also specifies what materials the Commission must make public. That provision likewise includes no requirement that the Commission make privileged materials publicly available:

> (14) The commission shall follow the following procedure in adopting a plan:
>
> * * *
>
> (b) Before voting to adopt a plan, the commission shall provide public notice of each plan that will be voted on and provide at least 45 days for public comment on the proposed plan or plans. *Each plan that will be voted on shall include such census data as is necessary to accurately describe the*

21

*plan and verify the population of each district, and shall include the map and legal description required in part (9) of this section.* [Emphasis added.]

The majority's lack of engagement with the constitutional text is perplexing, and its strained explanation for requiring publication of privileged material reflects its oversight.

## B. THE REMAINING WITHHELD DOCUMENTS AND AUDIO RECORDING

The majority's decision to order disclosure of documents on the basis of their titles and without reviewing them is striking. Like the majority, I have no idea what is in the documents or what was said during the closed session. The Commission has produced a privilege log that explains its rationale for claiming that the privilege applies. While courts are typically not in the business of second-guessing a lawyer's assertion that a document is privileged, courts can conduct *in camera* reviews if there is a concern as to the appropriateness of the asserted privilege. I would take that step here: plaintiffs and the public deserve as much. After that review, I might have agreed that some of the materials were not covered by privilege. The majority does not need this intermediate step because of the surprising categorical nature of its rule.

## IV. CONCLUSION

The constitutional amendment passed by the voters in 2018 balanced a requirement of openness and transparency with the ability of the Commission to obtain a degree of confidential legal representation necessary to accomplish its aims. The Commission has exercised that right with caution: only a single 75-minute closed session occurred out of hundreds of hours of public meetings (when the maps were drawn in full public-facing view), and only 10 memos have been withheld under the attorney-client and work-product privileges out of the thousands of pages of documents made available that reflect the

22

Commission's development of the proposed plans.  See generally Michigan Independent Citizens Redistricting Commission <https://www.Michigan.gov/micrc> (accessed December 19, 2021) [https://perma.cc/PBM6-KKU2] (linking to meeting notices, minutes, recordings, transcripts, comment portals, and other materials documenting the Commission's progress).

Our Constitution unambiguously affords the Commission "legal representation." By depriving the Commission of the common-law right to attorney-client and work-product privileges that are generally understood as defining an attorney-client relationship, the majority has put its own views above those of the voters.  The voters wanted the Commission to draw fair and legal maps.  They knew legal representation was important to do so successfully.  I therefore dissent.

Elizabeth M. Welch
Bridget M. McCormack
Megan K. Cavanagh